Jerry E. WOOLDRIDGE, Appellee,

v.

**CENTRAL UNITED LIFE INSURANCE COMPANY and Life of America Insurance Company, Appellants.**

No. 95–1544.

Supreme Court of Iowa.

June 18, 1997.

Rehearing Denied Sept. 18, 1997.

John D. Mayne of Mayne & Mayne, Sioux City, for appellant.

Marvin F. Heidman and Sabra K. Craig of Heidman, Redmond, Fredregill, Patterson, Schatz & Plaza, L.L.P., Sioux City, for appellee.

CARTER, Justice.

Defendant, Central United Life Insurance Company (Central United), appeals from an adverse judgment in an action brought by Jerry E. Wooldridge, who had been terminated as president of the company. That action, Woodbury County No. 107264C, was based on a severance agreement between Wooldridge and his employer and, in addition, sought benefits allowed under the provisions of Iowa Code chapter 91A (1993). The defendant asserts several grounds for reversal. We separately consider these contentions and affirm the judgment of the district court on all issues except the award of attorney fees under Iowa Code section 91A.8. On the attorney-fee issue, we modify the judgment. In a separate action, Woodbury County No. 110449C, Central United sought damages from Wooldridge for the improper performance of his duties as president of the company. That action was dismissed on the ground that it was required to be included as a compulsory counterclaim in No. 107264C. On Central United's appeal from that ruling, we reverse the judgment and remand the case to the district court for further proceedings.

Wooldridge was, at all relevant times, president of Central United, an Iowa corporation with its principal place of business in Sioux City. He had been with the company since 1964 and had been president since

1972. At the time of the transactions at issue here, all of the stock of Central United was owned by Central United Corporation, a holding company incorporated in Iowa. Eighty-five percent of Central United Corporation's outstanding stock is owned by Central Mutual Insurance Company, an Ohio corporation with its home office in Van Wert, Ohio. Sometime in 1991, Central Mutual decided it wanted to cease its life insurance operations. As a step in that direction, Central Mutual decided to dispose of Central United. That decision was made without the knowledge of Wooldridge. He learned of the decision when he attended a meeting of Central United's board of directors in February 1992. At this time he was informed of Central Mutual's decision to negotiate disposition of Central United. In order to encourage Wooldridge to remain as Central United's president during the transactions leading to the disposition of that company, he was offered certain incentives contained in a letter from the chairman of Central United's board who was also president and chairman of the board of Central Mutual. This letter, dated February 5, 1992, contained the following provisions.

In addition to your usual duties as President, you are to do the following:

1. Keep confidential and not disclose directly or indirectly to any person any trade secret, proprietary information or other business secret belonging to CUL, including but not limited to nonpublic information concerning the operations, financial condition, products or distribution system of CUL. In furtherance of such efforts, you will not duplicate, distribute or discuss any of the information with any party unless authorized in writing to do so by myself or Gerald Thatcher. You will abide by our determination as to what information is confidential. Thirty days after the sale offering memorandum is mailed by KPMG/Peat Marwick's prospective buyers, we will provide you with an authorization to seek other employment opportunities on a discreet basis.

2. Use your best efforts to assist in the preparation of documents, reports, and other information we will need for the sale of CUL.

3. Refrain from disclosing or discussing the proposed sale of CUL with any of the employees until authorized in writing to do so by myself or Gerald Thatcher.

4. Refer any and all prospective buyers to ... KPMG/Peat Marwick....

5. Except as directed by myself or Gerald Thatcher, refrain from participating in any negotiations for the purchase of CUL while an employee of CUL.

6. Remain in the employ of CUL until we determine your services are no longer needed.

As consideration for your performance of the above-enumerated responsibilities, we will pay you at the time of. closing the sale of CUL but not later than December 31, 1992, a lump sum fee of $10,000 and will transfer to you title to the 1990 Suburban. You will be responsible for taxes and any fees connected with the $10,000 payment and vehicle transfer.

Additionally, if we terminate your employment for reasons other than your breach of items 1–6, then we will provide you with the severance benefits listed on the attached Exhibit A.

Because this is a highly sensitive and confidential matter, if you fail to comply with any of the aforementioned items 1–6 or disclose the contents of this letter, you will be subject to immediate termination, and forfeit the $10,000, the Suburban, and all severance benefits on Exhibit A which are not mandated by statute.

Exhibit A to this letter agreement described, among other benefits, a provision for a service bonus equal to one week's pay for each full year of service completed as of Wooldridge's last day worked. Also included in this benefit package was a provision for maintaining a $10,000 life insurance policy for Wooldridge, the continuance of the company's health care coverage until he became eligible for Medicare, and the provision of a Medicare supplement thereafter. In addition, Wooldridge's wife was to be eligible for major medical benefits until age sixty-five and a Medicare supplement thereafter upon paying a stated fee for those coverages.

In the late spring of 1992, Life of America Insurance Company, a Texas corporation, owned primarily by David Harris, entered into negotiations with Central Mutual to acquire Central United. The negotiations matured into a formal agreement and plan of reorganization. That agreement called for Life of America Insurance Company to form a subsidiary, named LOA Merger Corporation, into which Central United would be merged. At the conclusion of this transaction, LOA Merger Corporation would own 100% of the stock of Central United. The initial proposal required approval of the Iowa Commissioner of Insurance, which was not obtained. Subsequently, Central United was redomesticated as a Texas corporation, and the transaction was consummated without the Iowa Insurance Commissioner's approval.

The lump sum payment of $10,000 and the transfer of the designated motor vehicle referred to in the February 5 letter agreement were concluded prior to December 31, 1992, as promised in the agreement. The merger agreement closed on July 31, 1993. On the next working day, David Harris went to Sioux City and terminated Wooldridge's employment with the company. In his testimony at trial, Harris indicated that this decision was not based on any particular factor relating to Wooldridge's performance but simply because he wanted to implement his own choice of the individual who would run the company. He selected for this task his own father, John Harris.

Following his termination, Wooldridge contended that his severance check was not in accordance with the letter agreement. That check consisted of one week's salary, ten days of sick leave, and twenty-six days of accumulated vacation time. When the dispute over the amount of his severance package was not resolved, he commenced the present action in August 1993. The action sought recovery for breach of the February 5, 1992 letter agreement and for wages recoverable under Iowa Code chapter 91A.

On April 4, 1994, the court established a discovery deadline, and a February 14, 1995 trial date. In December of 1994 that trial date was continued until April 1995. In January 1995 Central United requested leave to

amend its answer to state a counterclaim. That request was denied as untimely as was a March 6, 1995 request by Central United to amend its answer to allege the substance of the proposed counterclaim as an affirmative defense.

Soon after its efforts to file a counterclaim were denied, Central United commenced a separate action against Wooldridge to obtain substantially the same relief as was sought in the counterclaim. That suit was ultimately dismissed on the basis that the claim was barred by the compulsory counterclaim rule contained in Iowa Rule of Civil Procedure 29(a).` Appeal from that order has been consolidated with the appeal of the judgment disposing of Wooldridge's severance agreement and wage claims.

### I. Denial of Central United's Application to Amend its Answer to Assert Affirmative Defenses and a Counterclaim.

██ The first assignment of error raised by Central United is a claim that the district court erred in refusing its application to amend its answer to add a counterclaim and affirmative defenses.

██ **A. The proposed counterclaim.** Central United's proposed counterclaim alleged that Wooldridge caused it damage by leaking sensitive policyholder data to a person or persons outside the company and by neglecting his normal duties as president of the company. In denying Central United's application to amend, the district court concluded that the proposed counterclaim would inject new issues into litigation that had been pending for some time and thus unduly delay its completion. We review rulings of that nature for an abuse of discretion. *In re Marriage of Fields*, 508 N.W.2d 730, 732 (Iowa 1993). It appears that both items of recovery sought to be asserted in the proposed counterclaim and the basis therefor were matters known to Central United almost from the inception of the litigation. The action had been filed in August 1993. There had already been one continuance of the original trial date. Under the circumstances confronting the court, we are unable

to conclude that it abused its discretion in denying Central United's application to file a counterclaim. *See Bennett v. City of Redfield*, 446 N.W.2d 467, 474–75 (Iowa 1989) (denying motion to amend filed sixteen months after suit was commenced, twenty days before trial date, and after deadlines set by the court).

**B.** *The proposed affirmative defenses.* The proposed affirmative defenses mirrored the issues sought to be injected by way of counterclaim. These defenses thus attempted to inject new issues at a point even later in the litigation than had been the case with the proffered counterclaim. Here again, no abuse of discretion on the district court's part has been demonstrated. *See id.*

**II.** *Propriety of District Court's Ruling on Motion in Limine Excluding Evidence of Plaintiff's Improper Performance of His Duties as Central United's President.*

As part of the discovery in this case, Wooldridge's counsel took the deposition of David Harris. This examination disclosed Harris's intention to claim that Wooldridge had been deficient in his performance as president of Central United after learning of the proposed disposition of that company. Harris asserted a general inattentiveness to the job on Wooldridge's part and specifically claimed that Wooldridge had leaked sensitive policyholder data to a person or persons outside of the company.

Wooldridge filed a motion in limine seeking to preclude Harris from testifying about these claims at trial. The motion contended that these matters, even if true, did not affect Wooldridge's right to severance benefits under the February 5, 1992 agreement. The district court sustained this motion.

Central United urges on appeal that Wooldridge's right to severance benefits under the February 5, 1992 agreement was not only dependent on his compliance with the six conditions set forth in the contract but was also dependent, under the language of the introductory sentence of the agreement, upon proper performance of his "usual duties as President." The district court rejected that contention as do we. The controlling con-

tract provision concerning Wooldridge's entitlement to the prescribed severance package is found in the following language:

> [I]f we terminate your employment for reasons other than your breach of items 1–6, then we will provide you with the severance benefits listed on the attached Exhibit A.

At no time has Central United contended that Wooldridge was terminated for a breach of any of the six conditions listed in the agreement.

If Central United had acted in a timely manner, it could have asserted that any monetary loss caused it by the alleged failure of Wooldridge to properly perform his duties was a *setoff* against his claims under the severance agreement. Its attempt to do so was rejected on the basis that it came too late. We have upheld that ruling in an earlier portion of this opinion. As a result, the evidence kept from the jury in the ruling on the *motion in limine* was both factually and legally beyond the issues to be tried to the jury. The district court did not err in granting the motion in limine and rejecting the subsequent offer of proof.

In order to escape the conclusion to which the contract language leads, Central United asserts that Wooldridge opened the door to evidence concerning his performance of the usual duties of company president. We have carefully considered the testimony upon which this claim is made within its context and find no basis for concluding that it opened the door for evidence not relevant to the requirements for obtaining the severance benefits.

**III.** *Allowance of Recovery for Central United's Failure to Provide Medical Insurance Benefits Pursuant to Severance Agreement.*

Central United urges that the trial court erred in permitting the jury to award damages for denial of the medical insurance coverages granted Wooldridge and his wife under the severance agreement. This issue was raised in the district court by an objection to an instruction that told the jury that in its consideration of damages it could con-

sider the difference, reduced to present value, of the cost of major medical insurance for Wooldridge and his wife to age sixty-five and that which Wooldridge would have had to pay if Central United had abided the terms of the severance agreement. The jury was similarly instructed as to the cost of Medicare supplemental coverage after plaintiff and his wife reached age sixty-five and the cost of the $10,000 life insurance policy promised in the severance agreement.

The objection to the instruction was premised on Central United's contention that it was not required to honor the provisions of the severance agreement pertaining to these insurance coverages because of language in the severance agreement stating:

> It is hoped that these Plan coverages for retirees will be continued indefinitely, but the Company does reserve the right to change or terminate the Plan at any time.

Relying on this language, Central United's objection to the instruction was:

> We believe that is improper to give [the challenged instruction] for the reason that the contract upon which the plaintiff is claiming recovery in this case provided on its face in not ambiguous language that these benefits could be cut off at any time. They could be terminated or changed by the company. . . . The plaintiff himself said that all of these benefits could have been taken away whether he performed his end of the agreement or not.

In reviewing the record, it is apparent that the severance agreement identified the life insurance and medical insurance benefits to be paid to Wooldridge by attaching schedules of those benefits as they appeared in the company's retirement plan. The language pertaining to the employer's right to change or terminate the benefits referred to a retirement plan. Wooldridge was not claiming a right to these insurance coverages as a retiree but, rather, as a party to a severance agreement that expressly conferred these benefits irrespective of his employment status with the company.

The district court concluded that it was for the jury to determine whether this contract language supported Central United's claim that it could discontinue these benefits at will. That ruling affords no basis for reversal of the judgment. It was at least as favorable to Central United as the facts warranted. A strong argument could have been made that because Wooldridge was not a retiree the language did not apply to him as a matter of law. Our conclusions on this issue are not altered based upon Wooldridge's own ambiguous testimony when questioned about these coverages.

### IV. *Failure to Reduce Recovery by Amount of Unemployment Compensation Received by Wooldridge.*

 Central United urges that Wooldridge's recovery should be reduced by the amount of unemployment insurance benefits that he received following the termination of his employment. We reject this contention. Without deciding the effect of unemployment benefits on the recovery of general contract damages involving employee wages, we are convinced that this is not a matter that detracts from Wooldridge's right to recover the specific sums that are provided in the severance package at issue here. We base this conclusion on the terms of the agreement. We are convinced that it was the intention of the severance agreement that Wooldridge receive the sums provided without regard to any other posttermination remuneration that he might receive from other sources. Similarly, we conclude that damages otherwise recoverable under chapter 91A are not to be reduced by posttermination remuneration from collateral sources.

Central United notes that under Iowa Code section 96.5(5) one is disqualified from receiving unemployment benefits for any week for which that person has received a separation allowance or severance pay. It is not altogether clear whether this provision would apply to Wooldridge who did not receive severance pay and, as a result of that omission, was relegated to seeking breach-of-contract damages. We need not decide that issue here. If the statute is applicable, that would only be a ground for the proper administrative authority to seek recoupment of unemployment benefits that have been paid. It is not a matter that serves to reduce

Wooldridge's damage claim under the severance agreement or chapter 91A.

## V. *The Attorney–Fee Award.*

 Central United claims that Wooldridge's recovery of attorney fees pursuant to section 91A.8 was excessive. The total claim for attorney fees and expenses was $28,617.91. The actual attorney fee was a one-third contingent fee, but the claim was submitted on an hourly rate basis. The district court allowed a total award for fees and expenses in the sum of $25,736.45. We review this determination on an abuse-of-discretion standard. *Mississippi Valley Broad., Inc. v. Mitchell,* 503 N.W.2d 617, 619 (Iowa App.1993).

Central United's main challenge to the attorney-fee award involves hourly rate charges for paralegal services and hourly attorney-fee charges during the time the parties were waiting for the jury to return its verdict. We have carefully considered these contentions and conclude that based on these challenges the attorney-fee award allowed by the district court for services and expenses at trial should be reduced to the sum of $22,-190.45. After issuance of the procedendo from this court, Wooldridge may apply to the district court for an allowance of attorney fees and expenses for services performed on this appeal.

## VI. *Central United's Responsibility for Paying Wooldridge's Contractual Severance Benefits.*

 Central United asserts that, because the terms of the severance agreement with Wooldridge were established by its former parent corporation as the seller of the company, that corporation, Central United Corporation, should bear the obligation to honor the agreement rather than visiting that liability on a company now owned by a parent corporation that was an outsider to the agreement. We find no merit in this suggestion. Wooldridge's action was based on a contract and had to be pursued against the entity that agreed to pay the contractual severance benefits. That entity was Central United.

 In the same light, Wooldridge's chapter 91A claims were properly brought against Central United because it was the entity that served as his employer for purposes of invoking the remedies that are available against an employer under that legislation.

## VII. *Whether Compulsory Counterclaim Rule Precluded Central United From Bringing Separate Action for Monetary Losses Alleged to Have Occurred From Wooldridge's Failure to Properly Perform His Duties as President.*

 As previously discussed, the court, in Woodbury County No. 107264C, refused to allow Central United to counterclaim against Wooldridge to recover monetary losses attributable to his failure to properly perform his ordinary duties as president of the company. Following that ruling, Central United commenced an independent action asserting such claims. That action, Woodbury County No. 110449C, was ultimately dismissed by the district court on the ground that it should have been raised as a compulsory counterclaim in No. 107264C. Central United has appealed from this dismissal order.

Rule 29 of the Iowa Rules of Civil Procedure provides:

> A pleading must contain a counterclaim for every cause of action then matured, and not the subject of a pending action, held by the pleader against any opposing party and arising out of the transaction or occurrence that is the basis of such opposing party's claim, unless its adjudication would require the presence of indispensable parties of whom jurisdiction cannot be acquired. A final judgment on the merits shall bar such a counterclaim, although not pleaded.

Based on the language of this rule, we believe that Wooldridge's contention that the claims in the second action arose "out of the transaction or occurrence that is the basis for such opposing party's claim [in the prior action]" is not sustainable, and the district court erred in applying the rule 29 bar. Wooldridge has gone to great lengths throughout this litigation to maintain that the

transaction or occurrence that is the basis for his claim is a narrowly worded, written contract. He has been successful in obtaining a ruling from the district court establishing that matters involving the performance of his usual and ordinary duties as president of the company is a matter beyond the issues in Woodbury County No. 107264C.

Although Central United's effort to bring these matters before the court in No. 107264C was denied on timeliness grounds, rather than relevancy grounds, other rulings of the court in that action were totally inconsistent with trying Wooldridge's claims and the proposed counterclaim together, even if the counterclaim had been timely filed. As a result, we must conclude that the policy underlying rule 29, *i.e.*, disposing of related claims in a single action to avoid multiplicity of suits, is not present. Wooldridge's litigating position would have required separate trials in any event.

In *Sandbulte v. Farm Bureau Mutual Insurance Co.*, 343 N.W.2d 457 (Iowa 1984), this court held for purposes of rule 29 that a claim against an insurer for the neglect of its agents was an altogether different transaction or occurrence than the one giving rise to the rights of the parties under a specific contract of liability insurance. *Sandbulte*, 343 N.W.2d at 463. A specially concurring opinion expressed the view that although, in the ordinary course of things, the two claims *would* be considered to have arisen from the same transaction or occurrence, no compulsory counterclaim bar should be applied based on the prior litigating position of the party seeking to invoke such bar. *Id.* at 466.

We conclude that the reasoning of both the majority opinion and the special concurring opinion in *Sandbulte* supports a reversal of the judgment dismissing Central United's claims in No. 110449C. The judgment in that action is reversed, and the case is remanded to the district court for further proceedings. The judgment in No. 107264C is affirmed as modified. Costs on appeal are assessed three-fourths to appellant and one-fourth to appellee.

(No. 107264C) **AFFIRMED AS MODIFIED;** (No. 110449C) **REVERSED AND REMANDED.**

All justices concur except TERNUS, J., who takes no part.