, ORA SHOOK v. JACOB SHOOK *et al.,* Appellant.

**Divorce:** CRUEL AND INHUMAN TREATMENT: *Evidence.* Defendant in a divorce suit, who was 56 years old, accused his wife, 20 years of age, of unchastity before marriage, and denounced her, repeatedly as a "bitch" and "whore," and charged her with designs on his life. He also chided her for her extravagance, compared her with his first wife; would leave her, and sleep at the neighbors' houses, without telling her of his whereabouts; and later told her he would never live with her again as her husband. *Held,* that a decree for plaintiff on the ground that defendant's conduct was such as would tend to break down her nervous system and permanently impair her health would not be disturbed.

*Appeal from Davis District Court.*—HON. F. W. EICHEL-
BERGER, Judge.

SATURDAY, OCTOBER 12, 1901.

ACTION for divorce. Decree for plaintiff. Defendant
appeals.—*Affirmed.*

*Smoot, Mudd & Wagner* and *McNett & Tisdale* for
appellant.

*H. C. Traverse* and *H. C. Taylor* for appellee.

LADD, J.—The parties married at leisure and re-
pented in haste. The defendant was a widower of 56 years,
when married in June 1898, and of avoirdupois 105
pounds; 'the plaintiff was 36 years his junior—20 years
old—at that time, and 50 pounds heavier. They had courted
4 years, but lived together as husband and wife less than
6 months. He had 460 acres of unincumbered land; she
had youth, and, it is said, beauty as well. He was indus-
trious, but unlearned; she could read and sing. Both were
accomplished in this: they knew how to work. Though
reared in town, she accommodated herself to the new situa-
tion on a farm five miles in the country, where he had lived
50 years. Not a day was lost after the wedding, and every-
thing went tolerably well until he undertook to open the
book of her past life at the wrong page. True, he had trans-
ferred 320 acres of his land to his son in September, the
deed to which she had willingly signed, though under the
supposition that but 160 acres were included. This was on
the pretext of buying a place and residing in town, aban-
doned as soon as the deed was safely delivered. Yet he
had already inflicted the petty punishment of turning her
riding pony to pasture purposely to deprive her of its use,
and, rather than stop a team from work, had allowed her to
undertake a 10-mile journey on foot to Bloomfield and

return, and then cursed the neighbor who was kind enough to invite her to ride, and her for accepting the invitation. So, too, had he twitted, her, without the slightest cause, of going to town to meet traveling men, rather than to purchase necessaries. But he had been generous in that he had bought screens for part of the porch,—a thing, as he remarked, never thought of by his first wife; and had talked about buying furniture,—even reached the point where she had blacked his boots preparatory to starting for the store. Indeed, that extravagance would never have been obviated had he not bethought himself of the vile slander that she had admitted to his daughter-in-law that when at Cedar Rapids shortly before their marriage, she had slept with her sister's husband. Of course, this topic immediately superseded the purchase of furniture. The malice appeared in the omission of the portion of the story relieving it of any imputation of immorality. It seems the sister's husband, who was a traveling man, had returned home at 4 o'clock in the morning, and slept in his clothes on the outside of the bedding with the sister between them; and the latter had joked her about sleeping with a man. But the daughter-in-law and defendant insist she omitted the explanation, and boasted of her shame. The story is improbable. It is denied by plaintiff and her brother-in-law. Her subsequent conduct refutes it. We do not believe it. He admits that she pouted a week, and refused to sleep with him; while other proof shows she wept bitterly over the false accusation. Whether he betook himself to the woods for his meals at this time is in dispute. Certain 'it is, the days away from her in the field were scarcely long enough for him; and the wife he claims to have always addressed as "darling," and "every bone in her body" to have loved, received but scant attention. With such a companion well might she sigh, "Oh it is so lonesome out here!" The trouble seemed to lie in the very peculiar way defendant had in manifesting his affections. For instance, her

mother invited them to take Christmas dinner in town.   He
flatly refused, on the ground that the brother-in-law would
be there, though entirely without information on this point,
which was untrue; and seized the first opportunity of re-
peating the scandal mentioned, to her mother and brother.
The indignation of the latter was only suppressed by threats.
The answer of wife and mother was made in tears.   As her
brother was about to leave for the army, she insisted on ac-
cepting the invitation, although forbidden, and left Bloom-
field with his denunciations as "bitch" and "whore" ringing
in her ears.   He lost little time in declaring, with simulated
regret, that his wife had abandoned him.   But she came
back the day after Christmas and found her trunk packed.
Who did it we shall not stop to decide.   He either did not
notice her, or merely remarked, "You got back, did you,
Ora ?" to which he insists she responded, "Yes, but I did not
come to stay."   Both this man and his son's wife say that
she repeatedly announced her purpose in returning was to
get a better separation, and that she had been advised that
there must be a death in the family before a division of the
property.   Indeed, the latter insists that she discussed with
her the proposition of poisoning her husband, and the ease
of such a death.   This she denies, and is somewhat cor-
roborated by her mother and the circumstances proven.   Cer-
tain it is that he attempted no reparation or apology for the
attack upon his wife's honor, and offered not the slightest
inducement to the continuance of their relation as husband
and wife.   That night he passed at a neighbor's house leav-
ing her alone, and uninformed as to his whereabouts.   A
few days later her mother was there, and he claims to have
overheard a conversation between them when they supposed
him asleep, concerning a woman's attempt to poison her
paramour's wife, when one of them asked if the woman was
related to Seymour.   The response was, "Wake up, Sey-
mour, and take your medicine."   He testifies she then
added,   "I wish we could get Jake to take his medicine;"

and she, that the sentence about Seymour was a saying in
the community, and that, noticing him asleep, she jokingly
repeated it, with his name substituted for Seymour. From
that time on he utterly refused to eat of her cooking, and
ceased to occupy the same room. He actually betook him-
self to the woods, and there chopped and ate food of his own
preparation. Whether he really feared being poisoned is
extremely doubtful. As seen, he was a very small man, and
his conduct is quite as consistent with the design to get him-
self "shut of the Blacks." She remained about three weeks,
during which time he refused to talk with her, departing
for the timber at the break of day and returning at dark.
But he found time to have inserted in the local paper a
notice forbidding any one to furnish her goods on his credit.
The daughter-in-law testified that separation was the burden
of her talk, while to her mother she seemed to be in deep
distress. Before leaving she inquired of him if he would
live with her any longer, and was answered, with
curses, "I will never live with you again as husband, and if
you stay here I will get rid of you one way or another." He
denies this, but his conduct fully confirms her story. She
left January 16th, but returned in March, as she says, to see.
if they could not make up. Others declare that she ad-
mitted in their presence it was to procure a better separation.
Whatever her object, it was not gratified, for he absolutely
refused to see her, or go to the house while his wife was
there, and, after repeated efforts to secure an interview, with-
out avail, she departed forever. This is the story, with
many of the details necessarily omitted, and few of the facts
undisputed. No one can read the record without condemn-
ing much of defendant's conduct towards his wife, a mere
girl, as reprehensible in the extreme. Much of it was the
result of calculation, deliberately planned, to drive her from
the home he had promised her. Nothing could have been more
harassing and annoying to a woman of average sensibilities
than the course pursued. The court was certainly justified

in finding his treatment cruel and inhuman. But was it such to endanger life if continued? To most women such a life would have been utterly intolerable. True, he never undertook to beat her,—possibly because too little,—but his methods were infinitely more exasperating to the feelings of a sensitive woman than physical violence could have been. Accused of unchastity before marriage, and suspected thereof afterwards; denounced repeatedly as "bitch" and "whore," and charged with designs upon his life with mercenary motives; treated as an intruder and outcast in the home he had promised her; chided for extravagance, and made the subject of odious comparisons, these are some of the things which plaintiff endured, and which may well have brought about nervous prostration and insomnia, a condition which, if continued any considerable length of time, might, according to the physician, have permanently impaired her health and endangered her life. Possibly her affections were not deeply involved. Certainly his were not. But she was a woman, not shown to have been hardened to endure insult and neglect, nor to have been without the sensibilities peculiar to her sex. That such treatment would have a strong tendency to break down the nervous system and permanently impair the health of the average woman cannot, we think, be doubted. Whether it had the effect on plaintiff, the trial judge, with the parties before him, had a much better opportunity of ascertaining than have we, and it is enough here to say that, from a careful examination of the record, we are content with his conclusion. The amount allowed as alimony cannot, under the circumstances disclosed, be regarded as excessive.—AFFIRMED.