BENA J. RASMUSSEN, appellee, cross-appellant, v. ERNEST RASMUSSEN, appellant.

No. 50200.

(Reported in 107 N.W.2d 114)

JANUARY 11, 1961.

Zastrow, Noah & Smith, of Charles City, for appellant.

Newman, Redfern, McKinley & Sabbath, of Cedar Falls, for appellee, cross-appellant.

GARFIELD, C. J.—On June 18, 1959, plaintiff, Bena J. Rasmussen, filed her petition in equity against defendant, Ernest Rasmussen, asking a divorce on the ground the statute, section 598.8(5), Code, 1958, designates "such inhuman treatment as to

endanger the life of his wife." She also asked custody of the four minor children, alimony, child support and some other relief. The children were three boys and a girl, ages at the time of the trial on November 20, 1959, respectively 17, 15, 11 and 14. September 15, 1959, defendant filed his answer denying plaintiff's right to a divorce. October 16, 1959, he filed a cross-petition asking a divorce from plaintiff on the same general ground alleged by plaintiff, custody of the children, the real estate of the parties, some of the personalty and other relief.

Following trial plaintiff, on December 3, 1959, was granted a divorce, custody of the children and child support. The 200-acre farm owned jointly by the parties was ordered sold and the proceeds disposed of as hereinafter stated. Each party was to pay his or her attorney and defendant the costs. Other provisions of the decree will also be referred to later. On March 31, 1960, after defendant filed motion for new trial and other motions and resistances were filed, the decree was modified as to the disposition of proceeds from sale of the farm.

On defendant's appeal he contends plaintiff failed to establish cause for divorce and the division of property is inequitable. Plaintiff's cross-appeal challenges the modification on March 31 of the original decree. Some other questions are also presented.

I. Plaintiff and defendant were married September 2, 1940, and lived on the farm jointly owned by them in Grundy County until this action was started. On his attorney's advice defendant then went to live with an older sister in Cedar Falls. The farm belonged to defendant's father who died the winter before this marriage. Defendant's share, valued at $3000, in his father's estate, and $2000, borrowed from plaintiff's father at two per cent interest, made the down payment on the farm. Total purchase price was $22,000. Two new buildings were built at a cost of about $8200 and new material costing $3000 for another new building has been purchased. Defendant acquired his father's farm machinery at its appraised value.

The parties were not successful at farming. Losses from it were $2115 in 1956, $13,624 in 1957 and $8599 in 1958. Plaintiff worked in a produce house in Cedar Falls a year or two and in 1955 went to work at Rath packing plant in Waterloo. Defendant worked at the John Deere plant in Waterloo since

August 1958. Hours of work for both were from about 3 to 11:30 p.m. Much of the farm work was left to the two older boys. Defendant required them to work as late as 11 or 12 o'clock even on school nights and much of the day on Sundays. There is a good deal of evidence defendant lost interest in the farm, did not get the crops in until late, and refused to care for the hogs. The parties raised turkeys the last three or four years but lost heavily on the venture, largely because defendant refused to care for them. Fifteen hundred to 2000 turkeys died from lack of room or suffocation.

Three or four months before this suit was commenced plaintiff learned defendant was unduly attentive to a married woman who, with her husband, had been a mutual friend of the parties. Plaintiff's friends had previously told her of defendant's attention to the woman and that he was unfaithful. Plaintiff found under the seat of her automobile a small framed photograph of the woman, with bare legs, tight panties and a blouse, in an unladylike pose. Also a snapshot of her in a pregnant condition, pictures of her youngest child and a sentimental sweetheart valentine addressed "To My Darling Earnie", signed "All My Love Always, Ruth." (The woman's given name is Marion Ruth.) When defendant learned plaintiff had found these treasures he demanded their return, broke a window of plaintiff's locked automobile in an attempt to regain them and threatened to burn it as a punitive measure. Defendant admitted to plaintiff these exhibits were his and that he was having an affair with the woman.

Plaintiff testified she had seen defendant with Marion time and time again; they would go by the farm; she would be sitting as close as she could be—practically on his lap; they would park in the driveway to the farm buildings 10 or 15 minutes; several times defendant told plaintiff he wanted Marion and if she and her husband were divorced he would rent an apartment for her; Marion's husband brought suit for divorce before this action was commenced and has custody of their five children.

Two farm neighbors, one living just across the road, testified defendant admitted to each of them he had an affair with Marion. The nearest neighbor also said he saw defendant and Marion drive by slowly several times and they have also parked

in the Rasmussen driveway. She was sitting quite close to defendant.

The last witness also testified, "I think defendant has intentionally neglected the turkeys. * * * Though his wife tried to get him to take care of them, he wouldn't. * * * The manure wasn't cleaned out. * * * There were dead turkeys all through the manure. * * * When the turkeys grew larger he opened the door and some of them froze in the winter time. About a third of them died last winter. Once his hogs were sick and they lost a couple. His wife tried to get him to take care of them and he wouldn't go near them. * * * We [plaintiff and witness] worked until ten o'clock that night cleaning the hog house. * * * Defendant fed the turkeys some days, some days he didn't."

Duane, oldest Rasmussen boy, testified his father instructed him and his brother, 15, to work five and a half to six hours on school nights and quite a little on Sunday; he would judge his father worked on the farm a half hour to an hour and a half a day; "he didn't do much to amount to anything"; he has seen his father and Marion go by slowly quite often in the car; Marion would be quite close to him. Duane also said his father's conduct left his mother very nervous; when she found the pictures she was sick two days, she could hardly do anything around the house, she has been upset since then; lots of times he heard his mother crying at night, he did not know for sure why but he had a general idea it was because of Marion; he and, he thought, the other children would prefer to live with his mother.

Plaintiff testified that instead of helping the boys do the work defendant would sit in the house drinking coffee and make the boys work; if they did not do it right or if they got into an argument as to how it should be done he would beat them with a rope or club and sometimes slap them down and kick them. Defendant denied excessive cruelty to the children. Plaintiff also said defendant's language toward her and the children was very harsh; he swore at them very often; he would not take the children to church; when she asked defendant about his pay check from John Deere he said he did not have to account to plaintiff for his money; he always left the farm machinery stand out in the weather; she found out defendant was giving Marion money.

When asked how her husband's conduct affected her, plain-

tiff testified, "It's made a nervous wreck out of me and night after night I wouldn't be able to sleep and it upset me just terrible. * * * I have been nervous and upset ever since I found out, and sometimes before when people were telling me, how he was carrying on with this other woman. That and the loss of money and things also brought on a lot of worry."

There is other testimony of course. Some is unfavorable to defendant. Not all of it is favorable to plaintiff. She admitted she drank at a party "or something." Defendant testified she would get drunk and sick whenever they went to a dance and "she had to have 'a fifth' with her to work every week." There is also testimony plaintiff used profanity. She testified she threatened to "kick a man off the place" over what she regarded as his exorbitant demands for helping defendant plow and get the crop in. Defendant contends this shows plaintiff's physical strength.

Defendant did not deny or explain any testimony for plaintiff as to his intimacy with Marion. Nor did he deny he was inattentive to the farming operations although a farmer-witness said he thought defendant was doing a good job of farming until about a year before the trial. As previously stated, defendant left the farm in June when this suit was started. On September 3 he was served with an injunction preventing him from going on the farm. Defendant did not ask to see the children after he left the farm. His take-home pay at John Deere during this period was from $75 to $175 per week but he gave his wife or children none of it although he claimed them as dependents for income tax purposes. Defendant paid his sister nothing for the room he occupied.

The above is a sufficient indication of the evidence bearing on plaintiff's right to a divorce.

II. Upon the whole record, particularly the undenied testimony as to defendant's intimacy with Marion, we are inclined to affirm plaintiff's right to a divorce.

Although we review the evidence de novo we give weight to the trial court's decision, especially in the matter of credibility of witnesses, because of his superior position to determine the real truth. Brown v. Brown, 248 Iowa 802, 809, 82 N.W.2d 661, 665, and citations; Phillips v. Phillips, 251 Iowa 1310, 1315, 104

N.W.2d 832, 834, 835. The reason for this rule is also apparent in a case like this where the trial court is required to determine whether defendant's conduct would probably endanger plaintiff's health and life. Levis v. Levis, 243 Iowa 574, 578, 52 N.W.2d 509, 511; Shook v. Shook, 114 Iowa 592, 597, 87 N.W. 680.

Conduct of one spouse toward another of the opposite sex, even without adultery, may amount to such inhuman treatment as to give cause for divorce. Craig v. Craig, 129 Iowa 192, 194, 195, 105 N.W. 446, 2 L. R. A., N. S., 669, and citations; Brookins v. Brookins, 230 Iowa 1272, 1275, 1276, 300 N.W. 540, 541, 542; Brannen v. Brannen, 237 Iowa 188, 189, 190, 21 N.W. 2d 459, 460; Zuerrer v. Zuerrer, 238 Iowa 402, 27 N.W.2d 260; Hawkins v. Hawkins, 250 Iowa 233, 237, 93 N.W.2d 584, 586, citing Craig v. Craig, supra, and other precedents; Annotation, 157 A. L. R. 628, 636–640.

We think this is such a case. Plaintiff and two others testified defendant admitted to them he was having an affair with Marion and there is other evidence of improper intimate conduct of defendant toward her. A definition of "affair" is "an amorous relationship or episode between two people not married to each other; an amour." The word "amour" means "a love affair, especially one of an illicit or secret nature." Webster's New 20th Century Dictionary. Defendant and his counsel surely knew this is the kind of affair he was charged with. If in his admissions he used the term in some other sense, as a business affair—which seems quite improbable—such an explanation was open to him.

Of course the inhuman treatment that gives cause for divorce must endanger life. We have frequently held life may be endangered by impairment of health. In Hawkins v. Hawkins, supra, 250 Iowa 233, 237, 93 N.W.2d 584, 586, the wife (defendant) became very nervous and emotionally upset over conduct of her husband (plaintiff) like that of this defendant with Marion. Our opinion states: "* * * this court has repeatedly held that cruel and inhuman treatment endangering life may be committed without physical violence. Such wounds as plaintiff inflicted upon defendant are more searing, deeper and dangerous to health and physical and mental well-being of a good,

sensitive and trusting wife than blows and bodily injury, and leave scars that time will not efface nor heal." Several Iowa precedents are cited.

The trial court findings recite, "Plaintiff is in good health so far as this record indicates and is substantially able to be self-supporting, although not able to command the earnings which may reasonably be expected to be available to defendant." It is argued the statement plaintiff is in good health is irreconcilable with a finding of inhuman treatment such as to endanger life. We do not so view it. The statement obviously refers to plaintiff's apparent health at the time of trial, five months after this suit was commenced and the parties separated. It is part of the findings as to the financial circumstances of the parties. We have construed restoration of health and weight after a few months of separation, following failure of health and loss of weight, as tending "to establish that the conduct of defendant was inhuman and endangered life." Phillips v. Phillips, supra, 251 Iowa 1310, 1313, 104 N.W.2d 832, 833, citing Bouska v. Bouska, 249 Iowa 281, 284, 285, 86 N.W.2d 884, 886. See also Littleton v. Littleton, 233 Iowa 1020, 1025, 10 N.W.2d 57, 59.

III. After the decree was filed defendant moved for a new trial on two basic grounds: (1) Plaintiff's failure to reply to his cross-petition, and (2) the property settlement in the decree is inequitable. Defendant prayed for a new trial on the issues raised in his cross-petition or that the decree be. *modified,* evidently as to the property settlement. This motion was the first of several procedural moves by both sides which need not be recited in detail. A month and a half later defendant amended his motion for new trial by alleging for the first time plaintiff failed to prove her right to a divorce and praying that the decree be *set aside,* in addition to the relief asked in the original motion.

A month and five days still later plaintiff amended her petition to conform to the proof by alleging defendant committed adultery with Marion. She also replied to defendant's cross-petition by denying his right to a divorce. The court permitted both plaintiff's amendment and reply to stand, over defendant's objection. Defendant argues both rulings were

erroneous. The argument against permitting plaintiff to amend her petition challenges the sufficiency of the proof of adultery. Plaintiff argues the evidence is sufficient.

Our review of this equity case is on the merits de novo, not for the correction of errors at law, as in other cases. Rule 334, Rules of Civil Procedure. We are not required to decide whether the trial court was in error in permitting plaintiff to amend her petition or file her reply. We are concerned with whether the final decree as later modified is right. The State v. Orwig, 27 Iowa 528, 530, 531; Independent Sch. Dist. v. Iowa Employment Security Comm., 237 Iowa 1301, 1311, 1312, 25 N.W.2d 491, 497, 498.

We will say, however, the conclusion reached in Division II hereof is under the pleadings as they stood during the trial. It is unnecessary and, we think, inadvisable to decide whether proof of adultery is sufficient. It may be assumed, as we do in Division II, without so deciding, such proof is insufficient.

IV. We are clear plaintiff's failure, under the circumstances here, to reply to defendant's cross-petition until three months after the decree was filed (28 days before defendant's motion for new trial was overruled) entitles defendant to no relief here. It is true rule 73, Rules of Civil Procedure, requires a reply to a cross-petition and, according to rule 85(c), it must be filed within seven days after the cross-petition unless time is extended under rule 85(f). Time was not so extended here. Both parties, evidently with the acquiescence of the other, did not comply with the time requirements of our rules in filing pleadings.

Defendant claimed nothing for plaintiff's failure to reply to his cross-petition until his motion for new trial was filed. He consented to the trial without a reply. Defendant's alleged right to a divorce and plaintiff's resistance thereto were as fully litigated, by consent or acquiescence, as if the reply were on file. Delay in filing the reply under these circumstances should be disregarded. Markman v. Hoefer, 252 Iowa 118, 124, 106 N.W.2d 59, 63, and citations. See also rule 249, R. C. P. Defendant's delay in attempting to take advantage of plaintiff's failure to reply may be taken as a waiver thereof. City of Des Moines v.

Barnes, 237 Iowa 6, 11, 20 N.W.2d 895, 897, and citations; Bombei v. Schafer, 242 Iowa 619, 626, 47 N.W.2d 842, 846; 30A Am. Jur., Judgments, section 203; 49 C. J. S., Judgments, section 203.

Then, too, if plaintiff had been put in default for failure to reply to the cross-petition defendant would not thereby be entitled to a divorce on the cross-petition. He would still be required to prove his right thereto by competent evidence. Section 598.4, Code, 1958; Hopping v. Hopping, 233 Iowa 993, 997, 10 N.W.2d 87, 90, 152 A. L. R. 436, 439; 27A C. J. S., Divorce, section 165; 17 Am. Jur., Divorce and Separation, section 469. This he failed to do. He has not contended otherwise.

V. Defendant contends the division of property in the decree as modified is inequitable and excessively harsh upon him. Plaintiff has cross-appealed from the modification, on the court's own motion, of the original decree.

We will not recite the principal matters to be considered in awarding alimony and child support in controversies such as this. They are stated in Brannen v. Brannen, supra, 237 Iowa 188, 193, 21 N.W.2d 459, 462, and citations; Stillmunkes v. Stillmunkes, 245 Iowa 1082, 1088, 65 N.W.2d 366, 370; Nelson v. Nelson, 246 Iowa 760, 768, 68 N.W.2d 746, 751; Alberhasky v. Alberhasky, 250 Iowa 986, 1001, 97 N.W.2d 914, 924. These precedents do not add greatly to this language of section 598.14, Code, 1958: "* * * the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right." See also 27A C. J. S., Divorce, section 233(1).

Principal asset of the parties is their equity in the 200-acre farm jointly owned by them. It is subject to a first mortgage of nearly $9000. Also a second mortgage of about $8000 on which interest from March 1, 1953, is owing. The parties also have unsecured debts of over $14,000 to 24 different creditors. Three of these are on promissory notes totaling over $4400. One of the notes is for $2000, with 18 months interest at two per cent, to plaintiff's parents for part of the down payment on the farm. This debt was incurred over 18 years ago. These amounts are as of the time of the original decree, December 3, 1959. It

is probable they are now larger, at least by the amount of accumulated interest for more than a year. In addition to the farm the parties have personal property or money, valued at about $12,600 as of the date last mentioned.

The trial court found all the property is the result of the joint accumulations of the parties and they are both liable for the indebtedness. Also that there is grave doubt of defendant's ability to operate the farm to advantage. These findings are not challenged. The farm was ordered sold. From proceeds of the sale the total indebtedness, found to be about $31,600, was to be paid or otherwise discharged, $8000 was to be held in trust for the benefit of the four children, and the rest of the proceeds was to be equally divided between plaintiff and defendant, except defendant's share should not exceed $10,000. Plaintiff was awarded personalty and cash of the total value of about $12,400. The personalty consisted mainly of farm machinery, hogs valued at $450, and unharvested crop.

In overruling defendant's motion for new trial the court on its own motion struck the provisions of the decree regarding the $8000 trust fund and ordered this amount equally divided between plaintiff and defendant. Thus defendant would receive $14,000 from sale of the farm unless half the net proceeds, after deducting the $8000, were less than $10,000, as above explained. It is this modification of the decree from which plaintiff has cross-appealed.

Evidence at the trial (in November 1959) is that the farm is worth from $300 to $350 an acre. It is a matter of common, general knowledge, of which we may take judicial notice, that Iowa farm land has declined in value since the trial. Then too this farm, including the buildings, is "run down." We think the farm should not now be valued at more than $300 per acre— a total of $60,000. Under the decree as modified it seems probable the net proceeds of the sale, with the trust abolished, would be divided about equally between plaintiff and defendant who, as stated, jointly own the farm, personalty and money. We think the decree should be further modified to provide directly for such equal division of the net proceeds from the sale of the farm after the payment of the indebtedness.

Principal benefit to plaintiff under the decree, from a property standpoint, is the award to her of defendant's half interest (presumably) in the farm machinery, crops unharvested at the time of trial, hogs valued at $450 and cash of about $4000. This award does not seem excessive, inequitable or unduly harsh upon defendant under all the circumstances.

■ Plaintiff's cross-appeal is largely supported by argument that defendant probably will not pay the child support required of him by the decree. Plaintiff's affidavits have been filed herein and printed in her brief stating that $650 in child support was delinquent on November 3, 1960, and defendant has not visited the children nor asked to do so, although the decree provides for reasonable visitation rights. With reference to these affidavits we may say that although the case is triable here de novo, review must be of the record presented to the trial court. Albright v. Moeckley, 209 Iowa 1304, 1307, 230 N.W. 351. See also State v. Metcalfe, 204 Iowa 123, 126, 214 N.W. 874; 4A C. J. S., Appeal and Error, sections 1206, 1209.

Defendant was ordered to pay child support of $25 a week until the oldest boy became 18 (he was 17 when the petition was filed June 18, 1959) and then $10 a week for any child of the parties under 18 living with, and cared for by, plaintiff. Defendant does not complain of this allowance for child support and we think he should make these payments. The trust was apparently established to make secure a substantial sum for the benefit of the children. We are not inclined to reinstate this trust as plaintiff would have us. It would involve at least some expense to administer. We are disposed to further modify the decree, however, by providing that all past-due payments of child support shall be a lien upon defendant's share in the farm or the proceeds thereof, with power in plaintiff to release such lien.

Except as modified herein the trial court's decree as modified by it is affirmed and the cause is remanded to the district court for further proceedings in harmony herewith. One fourth the costs in this court to be taxed to plaintiff, three fourths to defendant.

426

Upon both appeals the cause is, as above provided—Modified, affirmed and remanded.

All JUSTICES concur.