Julie DeVall McELROY, Appellant,

v.

STATE of Iowa and Iowa State University of Science and Technology, Appellees.

No. 99–1446.

Supreme Court of Iowa.

Dec. 19, 2001.

Paige Fiedler of Fiedler & Townsend, P.L.C., Johnston, for appellant.

Thomas J. Miller, Attorney General, and George A. Carroll and Darci L. Frahm, Assistant Attorneys General, for appellees.

CADY, Justice.

Julie DeVall McElroy appeals from a jury verdict denying her claim for sexual harassment against the State of Iowa and Iowa State University. She asserts the district court abused its discretion in permitting the defendants to file an untimely answer, improperly excluded evidence as inadmissible hearsay, and erroneously instructed the jury on the elements of sexual harassment. We reverse and remand for a new trial.

## I. Background Facts and Proceedings.

Julie DeVall McElroy was enrolled as a graduate student in the Department of Curriculum and Instruction of the College of Education at Iowa State University (ISU). During the 1994–95 academic school year, McElroy was employed as a graduate assistant to Dr. Lynn Glass. Dr. Glass was a tenured professor of education in the Department. In addition to supervising McElroy at work, Dr. Glass served as her academic advisor and instructed her in at least one course. Dr. Glass was a male.

McElroy was primarily responsible for assisting Dr. Glass in organizing the SciLink II project. This project was an exchange and relationship-building program between high school students in Russia and the United States. The program culminated with a month-long trip to Moscow, Russia. It was sponsored by ISU. In the beginning of April 1995, McElroy accom-

panied Dr. Glass, along with fifty Iowa high school students and five Iowa high school teachers, to Moscow for the program. This trip was considered a condition of McElroy's employment.

Throughout the trip, Dr. Glass sporadically engaged in inappropriate behavior towards McElroy. Dr. Glass arranged for McElroy to share a two-room hotel suite with him for the entire trip. One room contained two beds, while the other room contained the couch, refrigerator, and television. On numerous occasions, Dr. Glass touched McElroy on her hands, arms, and knees, and gave her neck and foot massages. Dr. Glass also kissed McElroy on her forehead and cheeks. In addition, Dr. Glass shared intimate details regarding his sexual life with his wife, as well as other personal sexual experiences. When McElroy informed Dr. Glass she was uncomfortable with his behavior and the sleeping arrangements, he became upset and confrontational. McElroy detailed Dr. Glass's conduct and her feelings in a letter resembling a journal she wrote to her fiancé. During the trip, McElroy slept in the sitting room and Dr. Glass slept in the bedroom.

Approximately two weeks after returning from Russia, McElroy made a sexual harassment complaint. On May 15, 1995, McElroy showed the Department chair, Dr. Ann Thompson, the letter describing her experiences. Additionally, some of McElroy's complaints predated the Moscow trip, and basically consisted of inappropriate comments. Dr. Thompson notified Noreen Daly, the Dean of the College of Education, of the incidents. Dr. Glass acknowledged his inappropriate behavior to Dr. Thompson and Dean Daly. He was then instructed to have no contact with McElroy. Furthermore, Dr. Thompson removed Dr. Glass from his position as McElroy's academic advisor and instruc-

tor, and reassigned McElroy to work as a graduate assistant for another professor.

On June 29, 1995, McElroy filed a formal complaint with the ISU Affirmative Action Office. Jeanne Johnson, an attorney, was appointed by ISU to investigate the complaint. Johnson conducted an extensive investigation and concluded Dr. Glass's behavior was inappropriate and unprofessional, and violated the university's policy against sexual harassment. In addition, Johnson concluded Dr. Glass's conduct created a hostile employment and academic environment, and interfered with McElroy's academic progress. Johnson made several recommendations to ISU to rectify the situation and prevent further incidents. These recommendations included: eliminating interaction between Dr. Glass and McElroy and any similar personal relationships between Dr. Glass and any other students; sexual harassment training for Dr. Glass and for the faculty, staff, and graduate students in the College of Education; and a one-semester suspension without pay for Dr. Glass. Dean Daly adopted the report and its recommendations, but increased the suspension to a period of one year.

Dr. Martin Jischke, the president of ISU, invoked formal proceedings utilized for dismissal of a tenured faculty member. However, prior to the convening of the faculty committee that would hold the disciplinary hearing, Dr. Glass learned he had terminal colon cancer. Upon Dr. Glass's request, Dr. Jischke agreed to drop the disciplinary action against Dr. Glass due to his fragile health. McElroy did not contest this decision. Dr. Glass died approximately one year later.

In addition to the prior history of sexual harassment by Dr. Glass, McElroy claimed ISU failed to protect her from continuing harassment by Dr. Glass after she filed the complaint. McElroy alleged Dr. Glass vio-

lated Dr. Thompson's no-contact directive approximately seven times. Dr. Glass allegedly opened a door for McElroy, said "hello" in the hallway, and entered rooms to speak with McElroy when she was alone. McElroy claims she informed ISU authorities of most of the violations. ISU maintained it responded to each report of any attempt by Dr. Glass to maintain contact with McElroy.

McElroy filed a petition at law against the State and ISU in the district court on November 3, 1997, and an amended petition on November 5, 1997. The defendants were served on November 7.[1] The petition asserted seven counts, which included federal and state employment and education discrimination claims, a violation of 42 U.S.C. § 1983, and assault and battery and negligence claims.

On December 1, 1997, the defendants filed a motion for extension of time to move or plead so they could prepare a motion to dismiss. The defendants subsequently filed an extensive motion to dismiss on December 24, 1997. After McElroy agreed to dismiss her 42 U.S.C. § 1983 claim and her assault and battery and negligence claims, the defendants withdrew their motion to dismiss. A uniform scheduling order was entered which set the deadline for filing pleadings for December 10, 1998, and scheduled the trial for February 8, 1999. The trial date was later continued to June 7, 1999.

On October 27, 1998, the defendants filed a comprehensive motion for summary judgment. Based on an agreement between the court and counsel, McElroy received an extension of time to file her resistance. McElroy filed her resistance to the summary judgment motion on March 25, 1999. The court denied the motion on May 21, 1999.

On May 24, 1999, McElroy notified the defendants they had failed to file an answer to her petition. The defendants immediately filed a motion for leave to file an answer, and attached their answer as an exhibit. McElroy filed a resistance to the motion. She claimed prejudice and lack of good cause.

The district court granted the motion to file an answer on the morning of trial. The court found the defendants demonstrated good cause. Additionally, the court noted the law generally favors a trial on the merits. However, the court struck the affirmative defense of failure to mitigate damages from the answer. The court concluded McElroy would be prejudiced if the defendants were permitted to introduce that defense so late in the proceedings. Nevertheless, the defendants were allowed to present the affirmative defenses of (1) prompt remedial action, (2) exercise of reasonable care to prevent and correct sexually harassing behavior, and (3) failure of plaintiff to take advantage of preventive and corrective opportunities or to otherwise avoid harm.

During the presentation of her case, the district court excluded evidence McElroy attempted to introduce as inadmissible hearsay. First, the court limited the testimony of Lyn Shiffler, a high school teacher at Des Moines Roosevelt High School who worked on the SciLink II project and went to Russia in April 1995. Shiffler was prevented from testifying to a statement Dr. Glass made while at a pre-trip reception Shiffler hosted in her home for members of the project, and to conversations

1. For the remainder of this opinion, we will refer to ISU and the State collectively as the defendants, as the same counsel represented both entities. Initially, the estate of Dr. Glass was also named as a defendant in this action. However, McElroy subsequently voluntarily dismissed the estate from the lawsuit.

she had with McElroy in Russia concerning Dr. Glass's behavior. McElroy made an offer of proof and asserted the proposed testimony was not hearsay because it was not offered to prove its truth and, alternatively, constituted an exception to the hearsay rule.

Second, the district court limited the testimony of Dale Striegle. Striegle was a colleague of McElroy, and was Dr. Glass's graduate assistant before McElroy. Striegle accompanied Dr. Glass to Russia in 1994. The district court excluded testimony concerning complaints Striegle received from other students concerning Dr. Glass's behavior, as well as sexual comments Dr. Glass had made to Striegle regarding McElroy. McElroy failed to make an offer of proof following Striegle's testimony, nor did she offer an explanation on the record in an attempt to defeat the defendants' hearsay objections.

Lastly, the district court excluded portions of Johnson's investigative report and the letter McElroy wrote to her fiancé while in Russia. Redacted versions of both documents were offered in evidence as exhibits. Witness statements from interviews Johnson conducted were excluded from the report on hearsay grounds. Likewise, statements made by others were excluded from the letter on hearsay grounds. McElroy made offers of proof of the entire investigative report and of the letter.

At the close of the evidence, McElroy objected to several jury instructions. In particular, McElroy objected to one instruction as improperly stating the law on sexual harassment. Additionally, McElroy objected to the court's refusal to include two of her proposed jury instructions. The court denied the objections.

The jury rendered a verdict in favor of the defendants. McElroy subsequently moved for a directed verdict citing the defendants' failure to file a timely answer. She also filed a motion for a new trial, alleging the district court erroneously instructed the jury. The district court denied both motions.

McElroy appeals. She claims the district court abused its discretion in allowing the defendants to file a late answer and for excluding her proffered evidence as inadmissible hearsay. She further alleges the district court erred in instructing the jury.

## II. Standard of Review.

 We review a decision of the district court to permit the filing of an untimely answer for an abuse of discretion. *See Wooldridge v. Cent. United Life Ins. Co.*, 568 N.W.2d 44, 47 (Iowa 1997). Likewise, we review most evidentiary rulings by the district court for an abuse of discretion. *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000). However, we review hearsay rulings for correction of errors at law. *State v. Ross*, 573 N.W.2d 906, 910 (Iowa 1998) (review for errors because hearsay evidence is presumed to be prejudicial). Additionally, we review jury instructions for the correction of errors at law. *State v. Anderson*, 636 N.W.2d 26, 30 (Iowa 2001).

## III. Untimely Answer.

Iowa Rule of Civil Procedure 53(a) provides the defendant must serve an answer "within twenty days after the service of the original notice and petition upon [the defendant]." Iowa R. Civ. P. 53(a); *see* Iowa R. Civ. P. 105(b) (answer must be served within time limitations delineated in rule 53). However, when a defendant has filed a motion to dismiss and the motion is denied, as in this case, the answer is due within ten days following notice of the district court's ruling. Iowa R. Civ. P. 105(c); *see* 71 C.J.S. *Pleading* § 170, at

223 (2000); 61A Am.Jur.2d *Pleading* § 232, at 221 (1999) (motion to dismiss for failure to state a claim upon which relief may be granted extends defendants' time to file an answer). When the defendants failed to answer within the requisite time period, McElroy contends the district court should have found the defendants admitted all of the allegations in her amended petition under rule 72. Iowa R. Civ. P. 72(c); *see* 71 C.J.S. *Pleading* § 193, at 242.

Rule 72 describes the proper format of an answer. The answer must specifically admit or deny each allegation or paragraph of the petition and raise any facts that demonstrate any defenses the defendant plans to pursue. Iowa R. Civ. P. 72(a). Moreover, any fact contained in the petition not subsequently denied is deemed admitted, unless one of three exceptions applies.[2] Iowa R. Civ. P. 72(c). None of the exceptions are applicable to this case. *See id.*

■ Generally, even after the time to file an answer has expired, the district court may permit a defendant to file a late answer if "good cause" exists. Iowa R. Civ. P. 105(f); *see* 71 C.J.S. *Pleading* § 169, at 222 (a rule may grant district court discretion to enlarge time within which an answer may be filed even after the initial time period has expired). Additionally, we observe that Rule 107(a) specifically provides, in pertinent part:

> When by these rules ... an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion ... (2) upon motion made after the expiration of the specified period permit the

act to be done where the failure to act was the result of *excusable neglect* ....

Iowa R. Civ. P. 107(a) (emphasis added). Thus, these two rules appear to utilize separate standards to apply in determining whether a late answer will be permitted. However, rule 105(f) specifically relates to late answers, while rule 107(a) relates generally to any late filing as well as other untimely acts. Typically, when a general and specific statute cover the same matter, the specific statute governs over any conflict with the general statute. *City of Des Moines v. City Dev. Bd.*, 633 N.W.2d 305, 311 & n. 4 (Iowa 2001). This principle is instructive in our consideration of the two rules, and reveals that "good cause" is the test to use in determining whether or not a late answer may be filed.

Nevertheless, we believe the "good cause" standard actually subsumes the "excusable neglect" standard. In other words, "good cause" considers the reasons the answer was not timely filed and whether those reasons constitute "excusable neglect." Therefore, we believe it is pertinent to consider the existence of "excusable neglect" in determining whether "good cause" exists to permit a late answer to be filed.

■ "Excusable neglect" has been defined as "that neglect which might have been an act of a reasonably prudent person under the circumstances." 61A Am. Jur.2d *Pleading* § 235, at 224; *see Johnson Bank v. Brandon Apparel Group, Inc.*, 246 Wis.2d 840, 847, 632 N.W.2d 107, 111 (2001). Thus, if a defendant can assert reasonable grounds for failing to comply

---

**2.** The three exceptions found in the rule governing answers are:

(1) allegations of value or amount of damage, (2) averments in a pleading to which no responsive pleading is required or permitted,

and (3) facts not previously pleaded that are set forth in pleadings filed subsequent to the seventh day preceding the trial, all of which shall be deemed denied by operation of law.

Iowa R. Civ. P. 72(c).

with the applicable time requirements, excusable neglect is satisfied. *See Johnson Bank,* 632 N.W.2d at 111. In determining whether neglect in a certain case is excusable, the court must consider all of the surrounding facts and circumstances of the late filing. *Davis v. Immediate Med. Servs., Inc.,* 80 Ohio St.3d 10, 14, 684 N.E.2d 292, 296 (1997); 61A Am.Jur.2d *Pleading* § 227, at 219, § 235, at 223; 71 C.J.S. *Pleading* § 169, at 222.

 "Good cause" also considers the impact of the late answer under all of the circumstances. *See Millington v. Kuba,* 532 N.W.2d 787, 791–92 (Iowa 1995). Thus, another factor to consider in determining "good cause" is whether the plaintiff would suffer prejudice by the filing of the untimely answer. 61A Am.Jur.2d *Pleading* § 234, at 222. If the proposed answer would substantially change the issues in the case so as to cause unfair surprise to the plaintiff, the court will likely find prejudice. *Chao v. City of Waterloo,* 346 N.W.2d 822, 825–26 (Iowa 1984); *see Lynch v. City of Des Moines,* 454 N.W.2d 827, 838 (Iowa 1990); *Bennett v. City of Redfield,* 446 N.W.2d 467, 475 (Iowa 1989). However, if the proposed answer simply reiterated the theory the defendant had been advancing throughout the litigation, no prejudice will likely be found. *Chao,* 346 N.W.2d at 826. Furthermore, the court should consider whether the filing of the answer would further the interests of justice. *See Lynch,* 454 N.W.2d at 838; *Meier ex rel. Meier v. Champ's Sports Bar & Grill, Inc.,* 241 Wis.2d 605, 628, 623 N.W.2d 94, 105 (2001); 61A Am.Jur.2d *Pleading* § 233, at 221–22. Another consideration is whether the defendants presented a meritorious defense. *See* 61A Am.Jur.2d *Pleading* § 227, at 218; 71 C.J.S. *Pleading* § 169, at 222.

In reviewing the district court's decision in this case to permit the filing of the late answer, we must remember the determination rests in the sound discretion of the district court. *See Lynch,* 454 N.W.2d at 838; *Brown v. Guiter,* 256 Iowa 671, 675, 128 N.W.2d 896, 899 (1964); *In re Cheney's Estate,* 223 Iowa 1076, 1079, 274 N.W. 5, 8 (1937); 61A Am.Jur.2d *Pleading* § 227, at 218; 71 C.J.S. *Pleading* § 169, at 222. Accordingly, we will not interfere with the court's decision absent an abuse of discretion. *Brown,* 256 Iowa at 675, 128 N.W.2d at 899; 61A Am.Jur.2d *Pleading* § 235, at 223. We will find an abuse of discretion only when the district court exercised its discretion on clearly untenable grounds or to an extent clearly unreasonable. *Mercer v. Pittway Corp.,* 616 N.W.2d 602, 612 (Iowa 2000).

 In permitting the defendants to file an untimely answer, the district court appropriately considered both the circumstances surrounding the failure to timely file an answer and the circumstances surrounding the case. Immediately upon learning of their failure to file an answer, the defendants moved for permission to file an answer. At the hearing on the motion, counsel for the defendants explained the failure was an inadvertent oversight attributed to the passage of time following the filing of the motions to dismiss and for summary judgment and the change of attorneys responsible for the case.

The defendants were represented by the State of Iowa Attorney General's office. The assistant attorney general initially assigned to the case resigned not long after the motion for summary judgment was filed. When two different assistant attorneys general were assigned to defendants' case in January of 1999, the motion for summary judgment was still pending. Considering the stage of the litigation, the new attorneys assumed an answer had been filed. Moreover, no motion for de-

fault had been filed notifying the defendants of their oversight.

The defendants also explained why the defendants' original attorney did not file an answer. When the defendants filed the motion to dismiss, the time to file an answer had been extended until after the district court entered a ruling on the motion. Yet, the defendants withdrew the motion on February 5, 1998, after McElroy voluntarily dismissed some of her counts. Thus, the district court never entered a ruling, and no entry was made triggering the defendants' time period within which to file an answer. The defendants contended the original attorney had probably been waiting for the entry, and when it never came, inadvertently neglected to file the answer.

We agree with the district court that the failure to file an answer constituted excusable neglect. *See Cent. Nat'l Ins. Co. of Omaha v. Ins. Co. of N. Am.,* 513 N.W.2d 750, 756 (Iowa 1994). It was an oversight, attributable to a variety of circumstances that rendered the neglect excusable. Thus, we turn to consider the additional factors of good cause.

Once the inadvertence was discovered, the defendants immediately attempted to remedy their mistake. *See Mendelsohn v. Weiss,* 221 A.D.2d 166, 167, 633 N.Y.S.2d 143, 144 (N.Y.App.Div.1995). Thus, they did not willfully ignore the rules of procedure. *Cent. Nat'l Ins. Co. of Omaha,* 513 N.W.2d at 756; *Mobil Oil Corp. v. Christian Oil & Gas Distribs., Inc.,* 95 A.D.2d 772, 773, 463 N.Y.S.2d 253, 254 (N.Y.App. Div.1983). Nor were they employing a deliberate tactic to delay the litigation. *See Special Prods. Mfg., Inc. v. Douglass,* 159 A.D.2d 847, 848, 553 N.Y.S.2d 506, 508 (N.Y.App.Div.1990) ("Intentionally and willfully occasioned delay further militates in favor of denying defendant's motion."). On the contrary, the case was fully litigated as if an answer had been on file. *See Rasmussen v. Rasmussen,* 252 Iowa 414, 422, 107 N.W.2d 114, 119 (1961). The defendants consistently advanced potentially viable meritorious affirmative defenses in good faith during the pre-trial proceedings. *Cf. Brown,* 256 Iowa at 675, 128 N.W.2d at 899 (in striking amendment, court considered fact that defendant did not press affirmative defense); *Special Prods. Mfg., Inc.,* 553 N.Y.S.2d at 509. Extensive discovery was conducted. Both parties propounded and answered interrogatories. McElroy deposed eleven witnesses. By the time McElroy informed the defendants of their mistake, the district court already ruled on a comprehensive motion for summary judgment and the issues had been fully developed by the parties.

Nevertheless, McElroy argues that the district court abused its discretion due to the inherent prejudice she suffered by not knowing which allegations of the petition the defendants would admit or deny or what affirmative defenses they planned to assert until a few days before trial. However, from our review of this record, we cannot discern any prejudice to McElroy. *See Antonious v. Muhammed,* 188 A.D.2d 399, 399, 591 N.Y.S.2d 386, 386 (N.Y.App. Div.1992). In their motion for summary judgment, the defendants contested all of the fighting issues raised by McElroy in her petition. In essence, the defendants argued McElroy was unable to satisfy the elements of any of the counts asserted in the petition. Specifically, the defendants claimed McElroy was unable to prove any impact on her academic progress or employment, or any denial of employment opportunities by ISU in retaliation for her complaint. The defendants' answer simply reiterated the positions they had asserted in their motion for summary judgment. *See Chao,* 346 N.W.2d at 826. Accordingly-

ly, the issues raised in the answer had been previously litigated in the pre-trial proceedings. *See* 61A Am.Jur.2d *Pleading* § 344, at 265.

Furthermore, the motion for summary judgment mentioned the affirmative defenses that were subsequently included in the defendants' answer. The defendants claimed they took prompt and thorough remedial action after the filing of McElroy's initial complaint and after reports by McElroy of further contact by Dr. Glass. In discussing the action ISU took, the defendants also claimed they exercised reasonable care to prevent any sexually harassing behavior. In addition, the defendants suggested McElroy did not take advantage of all of the corrective opportunities provided by ISU by failing to report all of the alleged continuing sexual harassment violations. Moreover, the extensive discovery process revealed to McElroy that these three affirmative defenses would be heavily relied upon by the defendants at trial. Additionally, these were affirmative defenses established by United States Supreme Court and other jurisdictions' precedent. Consequently, McElroy was sufficiently apprised of the defendants' proposed defenses. 71 C.J.S. *Pleading* § 159, at 212.

McElroy further contends she was prejudiced because two of the affirmative defenses did not exist at the time the defendants' answer was due. The Supreme Court established the latter two affirmative defenses in two opinions it delivered on June 26, 1998. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633, 655 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 2293, 141 L.Ed.2d

662, 689 (1998). Yet, even if the defendants had filed a timely answer, they could have sought the court's permission to amend their answer to include these additional defenses pursuant to Iowa Rule of Civil Procedure 69(d). Iowa R. Civ. P. 69(d); *see* 61A Am.Jur.2d *Pleading* § 380, at 299 (discussing Federal Rules of Civil Procedure). Rule 69(d) provides that the court shall freely grant a motion for leave to amend when required by the interests of justice. Iowa R. Civ. P. 69(d). Moreover, federal courts have excused a defendant's failure to plead an affirmative defense when "the defense is created by a new rule of law following a decision in an unrelated case handed down after the defendant has already filed its answer." 61A Am.Jur.2d *Pleading* § 379, at 299 & n. 61. When a defense is unknown or unavailable at the time the defendant is required to answer, the defendant should be permitted to later amend the answer to add the defense. *See* 71 C.J.S. *Pleading* § 168, at 221. Furthermore, a defendant may first raise an affirmative defense in a motion for summary judgment as long as the plaintiff is not prejudiced. *See* 61A Am.Jur.2d *Pleading* § 378, at 295–98, § 381, at 301.

 We think it is also important to note that McElroy tacitly approved of the defendants' delay in filing an answer. *See Bombei v. Schafer*, 242 Iowa 619, 626, 47 N.W.2d 842, 846 (1951); *City of Des Moines v. Barnes*, 237 Iowa 6, 11, 20 N.W.2d 895, 897 (1945). McElroy learned of defendants' failure to file an answer on February 26, 1999. However, she did not inform the defendants of this mistake until May 24, 1999. Additionally, McElroy never filed a motion for default under Iowa Rule of Civil Procedure 231(b).[3] It was

---

**3.** As a general rule, the Pennsylvania court system ignores the filing of an untimely answer if the plaintiff has not moved for a default judgment. *See Francisco v. Ford Mo-*

*tor Co.*, 397 Pa.Super. 430, 435, 580 A.2d 374, 376 (1990). The rationale supporting this rule is derived from the principle that the plaintiff must not have been prejudiced by the

not until after the defendants filed their motion for leave to file an answer that McElroy entered an objection. Thus, McElroy made no effort to enforce the rules of civil procedure until the damage was already done and the answer was already filed. *Bombei*, 242 Iowa at 626, 47 N.W.2d at 846. This is another factor a court may consider in determining good cause.

We conclude the district court's decision to permit the late filing in this case furthered the underlying principle of our rules of civil procedure that the justice system favors deciding a case on its merits rather than on procedural grounds. *See Cent. Nat'l Ins. Co. of Omaha*, 513 N.W.2d at 756; 61A Am.Jur.2d *Pleading* § 235, at 223. We have previously recognized a liberal interpretation of the time filing periods advances this principle. *See Cent. Nat'l Ins. Co. of Omaha*, 513 N.W.2d at 756; *Fosselman v. Waterloo Cmty. Sch. Dist.*, 229 N.W.2d 280, 284 (Iowa 1975). The decision to apply a liberal interpretation to this case was within the district court's discretion. *See Brown*, 256 Iowa at 675, 128 N.W.2d at 899; *In re Cheney's Estate*, 223 Iowa at 1079, 274 N.W. at 8. In exercising its discretion, the district court excluded the affirmative defense of failure to mitigate damages because McElroy would suffer prejudice if it was admitted. We will not second-guess the district court's discretionary determination that the defendants demonstrated good cause, and McElroy failed to prove prejudice on the other issues raised by the answer. *See Meier ex rel. Meier*, 623 N.W.2d at 105.

## IV. Jury Instructions.

We first address whether the district court erroneously instructed the jury on the elements of the federal sexual-harassment-in-employment claim. The jury was told McElroy was required to "prove all of the following propositions by [a] preponderance of the evidence":

1. Plaintiff was subjected to harassment in her work environment; and

2. Such conduct was based on plaintiff's gender; and

3. Such conduct was unwelcome; and

4. Such harassment was sufficiently severe or pervasive that a reasonable person would find Plaintiff's work environment to be hostile or abusive.

5. At the time such conduct occurred and as a result of such conduct, Plaintiff believed her work environment to be hostile or abusive; and

6. The harassment affected a term, condition, or privilege of Plaintiff's employment;

7. Plaintiff was damaged by the harassment.

McElroy contends this instruction incorrectly required her to prove the same element twice. She believes that proof of elements 4 and 5 would also satisfy element 6. Specifically, she claims proof that the harassment was so severe or pervasive that it rendered the work environment hostile or abusive would necessarily constitute proof that it altered the conditions of employment.

Under Title VII of the Civil Rights Act of 1964,

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

late answer if it did not seek judgment by default. *Id.* Despite this rule, the district court still has the discretion to strike an untimely answer. *Id.* at 378. The plaintiff's failure to file a motion for default is a factor district courts may wish to consider in determining whether a plaintiff has suffered prejudice by the defendant's delay.

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

42 U.S.C.A. § 2000e-2(a)(1) (1994). Thus, a claim under Title VII requires the discrimination to affect the compensation, terms, conditions, or privileges of employment.

It is widely recognized that sexual harassment is a form of sexual discrimination actionable under Title VII. *See Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 897 (1st Cir.1988). It is equally recognized that harassment can occur in two related ways. *Id.; see Chambers v. Trettco, Inc.,* 463 Mich. 297, 310, 614 N.W.2d 910, 915 (2000). One type of harassment is linked to the grant or denial of tangible aspects of employment. *Lipsett,* 864 F.2d at 897. This is known as *quid pro quo* sexual harassment. *Id.* Additionally, in 1986, the United States Supreme Court decided the watershed case of *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 60 (1986), which held that a sexual harassment case could also be brought under Title VII on the basis of a hostile or abusive work environment. Thus, Title VII is violated when sexual harassment is so "severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60 (citations omitted).

The concept that a hostile work environment claim is actionable when the sexual harassment is so severe or pervasive as to alter the conditions of employment and create an abusive working environment has been frequently applied by courts since *Meritor* and is well engrained in the law. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 1509–10, 149 L.Ed.2d 509, 513 (2001). The district court in this case adopted this concept in setting forth the elements of a sexual harassment claim by requiring McElroy to not only establish that the sexual harassment constituted an abusive work environment, but also that the harassment altered the conditions of employment. Although both *quid pro quo* and hostile working environment sexual harassment claims require discriminatory conduct that affects the conditions of employment, we do not believe a hostile work environment claim requires specific proof of an altered work condition beyond the objective and subjective proof of a hostile work environment. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295, 302 (1993) (sexually objectionable environment must be objectively and subjectively offensive). In fact, to require specific proof would actually be contrary to the rationale responsible for establishing such a claim.

A hostile work environment claim is premised on the concept that sexual harassment can impact the conditions of employment well beyond the denial or granting of economic or tangible benefits. *Meritor Sav. Bank,* 477 U.S. at 64, 106 S.Ct. at 2404, 91 L.Ed.2d at 58. Title VII covers more than the terms and conditions of employment "in the narrow contractual sense." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201, 206 (1998). Instead, when an employer creates a hostile work environment, employees are forced to "'run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living....'" *Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 59 (citations omitted). The hostile or abusive work environment itself affects a condition of employment because the employee must endure an unreasonably offensive environment or quit

working. *Lynch v. City of Des Moines,* 454 N.W.2d 827, 834 (Iowa 1990).

Thus, when an employee is exposed to sexual harassment that is so severe or pervasive that it creates an abusive working environment, the sexual harassment necessarily affects a condition of employment. The conditions of employment are altered by the existence of the hostile working environment. This is the very essence of the claim. However, if a court instructs the jury that a plaintiff must not only establish the existence of an abusive working environment but must additionally prove the harassment affected a condition of employment, it is very possible that the jury would view the additional element to require the plaintiff to show the harassment altered some tangible or economic employment benefit. This, of course, is the very antithesis of a claim for sexual harassment based on a hostile work environment. *See King v. Bd. of Regents of Univ. of Wisconsin Sys.,* 898 F.2d 533, 537 (7th Cir.1990) (loss of tangible job benefit is not necessary to establish under hostile work environment claims because harassment itself affects the terms or conditions of employment); *Bundy v. Jackson,* 641 F.2d 934, 943–44 (D.C.Cir.1981); *Lynch,* 454 N.W.2d at 834.

 We conclude the instruction given by the district court in this case, although derived from an accurate statement of the law, was misleading and confusing. When an instruction is confusing or conflicting, we are generally required to reverse. *Anderson v. Webster City Cmty. Sch. Dist.,* 620 N.W.2d 263, 268 (Iowa 2000). In this case, the instruction could reasonably be interpreted to require proof of a tangible loss. When both altered conditions of employment and hostile or abusive work environment are included as separate elements of a claim for recovery, it would be reasonable for the jury to

conclude that altered conditions mean something other than a hostile or abusive work environment. Under such an interpretation, the instruction was clearly erroneous and prejudicial. Consequently, we are required to reverse.

## V. Remaining Issues.

Because we are obligated to remand this case for a new trial, we will briefly consider the remaining issues presented on appeal because they may occur again at the new trial. McElroy claims the district court also erred in refusing to submit two proposed instructions to the jury. She contends the two instructions were necessary to completely and adequately inform the jury on the law of sexual harassment.

 The first proposed instruction stated the alleged incidents of offensive conduct must not be judged as isolated events, but in light of the preceding circumstances and the nature of the relationship. We recognize that the evidence presented in a sexual harassment action must not be compartmentalized into individualized incidents, but must be considered in its totality. *See Madison v. IBP, Inc.,* 257 F.3d 780, 793 (8th Cir.2001). However, we find the jury was adequately instructed on this principle. Although the court did not submit the specific instruction proposed by McElroy, it did instruct the jury to consider the alleged offensive conduct in view of all of the circumstances. Additionally, the court specifically instructed the jury to consider the frequency and severity of the conduct, whether the conduct was physically threatening or simply an offensive utterance, and whether the conduct unreasonably interfered with McElroy's work performance. The United States Supreme Court has pronounced these factors as constituting the "circumstances" for courts to consider in evaluating the totality of the circumstances. *Faragher,* 524 U.S. at

787–88, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; *Harris,* 510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302–03; *accord Jackson v. Quanex Corp.,* 191 F.3d 647, 659 (6th Cir.1999). Furthermore, no instruction told the jury to view the offensive conduct in isolation. Considering the instructions in their entirety, we conclude the underlying theory of McElroy's proposed instruction was adequately covered. *See Beard v. Flying J, Inc.,* 266 F.3d 792, 801 (8th Cir.2001); *Johnson v. Interstate Power Co.,* 481 N.W.2d 310, 324 (Iowa 1992).

█ McElroy additionally requested the court to instruct the jury that the mere presence of an employee "who ha[s] engaged in particularly severe sexual harassment can create a hostile working environment." We believe that in some circumstances the harasser's mere proximity to the plaintiff may in fact create a hostile work environment. *See Adusumilli v. City of Chicago,* 164 F.3d 353, 362 (7th Cir.1998); *Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 718 (3d Cir. 1997); *Ellison v. Brady,* 924 F.2d 872, 883 (9th Cir.1991). However, this is not a blanket rule to be applied in every sexual harassment action. *Konstantopoulos,* 112 F.3d at 718. Instead, this is a factual determination to be made by the jury on a case-by-case basis. *Id.* at 715. The jury in this case was instructed to take account of all of the circumstances in analyzing the severity and pervasiveness of the conduct. Thus, the jury could have considered Dr. Glass's presence when determining whether McElroy stated a viable claim. *See Hathaway v. Runyon,* 132 F.3d 1214, 1221 (8th Cir.1997). Furthermore, during the trial, McElroy suggested the jury should consider Dr. Glass's presence as creating a hostile work environment. *See Beard,* 266 F.3d at 800. Under these circumstances,

the trial court did not err in refusing the requested instruction.

McElroy also claims the district court improperly excluded evidence of prior out-of-court statements concerning the behavior of Dr. Glass. This evidence included statements contained in the investigative report derived from interviews conducted by the investigator. The district court determined these statements violated the rule against hearsay. McElroy claims the statements were outside the rule against hearsay and admissible to either show McElroy's state of mind or knowledge and responsive conduct by the defendants.

█ Iowa Rule of Evidence 801(c) defines hearsay as an out-of-court statement offered for the purpose of proving the truth of the matter asserted. Iowa R. Evid. 801(c); *see Barrett v. Acevedo,* 169 F.3d 1155, 1163 (8th Cir.1999); *State v. Hollins,* 397 N.W.2d 701, 705 (Iowa 1986). However, a statement that would ordinarily be deemed hearsay is admissible if it is offered for a non-hearsay purpose that does not depend upon the truth of the facts presented. 7 James A. Adams & Joseph P. Weeg, *Iowa Practice* § 801.1, at 569, § 801.4, at 578 (1998) [hereinafter *Iowa Practice* ]; John W. Strong et al., *McCormick on Evidence* § 246, at 97 (5th ed.1999) [hereinafter *McCormick on Evidence* ]. For example, the statement may be offered simply to demonstrate it was made, to explain subsequent actions by the listener, or to show notice to or knowledge of the listener. *See Barrett,* 169 F.3d at 1163 (effect on listener); *State v. Mitchell,* 450 N.W.2d 828, 832 (Iowa 1990) (responsive conduct); *Roberts v. Newville,* 554 N.W.2d 298, 300 (Iowa Ct.App.1996) (discussion of all examples); 7 *Iowa Practice* § 801.4, at 578–83 (same); *McCormick on Evidence* § 249, at 102 (same). Although a statement may be purportedly offered for a non-hearsay purpose, the district

court must still determine if the party's true purpose in offering the evidence was in fact to prove the statement's truth. *Hollins*, 397 N.W.2d at 705; *State v. Martin*, 587 N.W.2d 606, 610 (Iowa Ct.App. 1998); 7 *Iowa Practice* § 801.1, at 569. Furthermore, the court must find the statement relevant to the purpose for which it is offered. *Mitchell*, 450 N.W.2d at 832; *Hollins*, 397 N.W.2d at 706; 7 *Iowa Practice* § 801.4, at 581–83. Lastly, if the evidence is admitted, the court must limit its scope to that needed to achieve its purpose. 7 *Iowa Practice* § 801.4, at 582.

On retrial, the district court should consider whether the excluded evidence has value independent of the truth of the matter asserted in the statement. Generally, out-of-court statements may be relevant in sexual harassment actions to prove either notice or responsive conduct on behalf of the defendant. *See Baker v. McDonald's Corp.*, 686 F.Supp. 1474, 1478 & n. 10 (S.D.Fla.1987). Furthermore, internal documents relied upon by an employer in making employment decisions in a discrimination case are generally not hearsay because they can be relevant to explain the employer's conduct. *Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir.1997).

## VI. Conclusion.

Although the district court did not abuse its discretion by permitting the defendants to file an untimely answer, we conclude McElroy was prejudiced by the instruction requiring her to prove the sexual harassment affected a term or condition of her employment. Consequently, we are obligated to reverse and remand for a new trial.

**REVERSED AND REMANDED.**

All justices concur except LAVORATO, C.J., who takes no part.