# IN THE COURT OF APPEALS OF IOWA

No. 22-0397
Filed July 13, 2023

**STATE OF IOWA,**
　　Plaintiff-Appellee,

**vs.**

**LAWRENCE GEORGE CANADY III,**
　　Defendant-Appellant.
_____

　　Appeal from the Iowa District Court for Woodbury County, Patrick H. Tott, Judge.

　　The defendant appeals his convictions and sentences for involuntary manslaughter, willful injury causing bodily injury, and assault causing bodily injury. **REVERSED AND REMANDED FOR NEW TRIAL.**

　　Martha J. Lucey, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

　　Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

　　Heard by Bower, C.J., and Tabor and Greer, JJ.

**GREER, Judge.**

A jury convicted Lawrence Canady III of voluntary manslaughter, willful injury causing bodily injury, and assault causing bodily injury. Canady challenges some of the district court's evidentiary rulings and argues there is insufficient evidence to support his conviction for voluntary manslaughter. Canady also challenges his sentences, claiming the court should have merged his convictions for voluntary manslaughter and willful injury causing bodily injury, wrongly relied on the minutes of testimony when imposing sentence, and failed to state adequate reasons on the record for consecutive terms. Because some evidence was improperly admitted, we reverse and remand for a new trial.

**I. Background Facts and Proceedings.**

Following the May 1, 2021 shooting death of Martez Harrison, Canady was charged with the first-degree murder (count I), willful injury causing serious injury (count II), and assault causing bodily injury (count III). Canady pled not guilty to each of the charges, and the case was tried to a jury over several days in late 2021.

At trial, the State introduced into evidence a video from a security camera that captured a fight between Canady and Harrison outside of a bar in Sioux City. As Canady fought Harrison, seventeen-year-old D.E. shot Harrison. After the first shot, Canady continued punching Harrison, while D.E. walked closer and fired a second shot. After a few more punches and kicks to Harrison by Canady, Canady

and D.E. fled separately.[1]  Harrison died from the gunshot wounds later the same day, and Canady and D.E. were quickly apprehended by police.

The State's theory of the case was that D.E. and Canady planned to kill Harrison and worked in conjunction to do so.  In support of this theory—and over Canady's objections—the State introduced into evidence an audio recording of a jail phone call between Austin Rockwood and Canady (while Rockwood was jailed).  During the phone call on April 30, Rockwood told Canady that Harrison hit Rockwood's girlfriend in the face with a bottle the night before.  Canady responded in several ways, saying he would "put [Harrison] on his fucking neck" and "pick his little ass up and slam him dead on his fucking head."  At one point, Rockwood told Canady that "it's tax season," and Canady responded a few seconds later, "It's tax time.  I swear to God."  At trial, Harrison's fiancée, Jessica Goodman, was allowed to testify what she believed Canady meant by "tax time"; she testified, "Taking them—taking him for everything he gots; as in his pockets, everything, fighting him, whatever it takes at this point.  That's what tax season means."

The State also introduced a video that was recovered from D.E.'s cell phone.  The video was recorded on April 26, and it appears Canady is holding the phone recording while he raps along to a song that includes several names and violent imagery.  Canady raps along to a line about Teso or Tezzo, who "got hit" plus lines about "my glock" and "catching bodies."  In the video, Canady also adds

---

[1] The video itself is not perfectly clear; it came from a security camera attached to a business near the bar and captured the actions of several individuals who were some distance away during the night—around 1:00 a.m.  That said, Jessica Goodman, the fiancée of Harrison, was personally present at the scene of the fight and shooting; she testified at trial in conjunction with the playing of the video for the jury.  Her narration went largely uncontroverted.

"gang gang gang," flashes a tattoo on his hand, and pans the camera to D.E., who is fanning out money. Multiple witnesses at trial testified that the decedent, Martez Harrison, was also known by the nicknames Tez and Tezzo. The defense offered evidence that the song Canady was rapping along to is by a group from Chicago; had hundreds of thousands of views on Youtube; and referenced several names, including someone named Teso (rather than Tezzo).

Finally, the State introduced a picture posted by D.E.'s Snapchat account that Goodman saw a few hours after Harrison was shot. According to Goodman, at approximately 3:30 a.m. on May 1, she saw the picture, which showed it was posted "8h ago" or eight hours before Goodman saw it. The photo included D.E. and another seventeen-year-old, J.H., standing in what appears to be a clothing store. The display name on D.E.'s account was "Dwave" with multiple emojis, including a gun emoji. Additionally, D.E. added text over the picture, which said, "We bussing but don't think shit sweat [gun emoji]." At trial, Goodman twice offered her opinion on the meaning of the picture and caption. She testified, "I'm pretty sure he meant sweet. But, basically, that they got the guns and they're not sweating shit." A few questions later, Goodman testified, "I just think that it means that they got guns and they're going to shoot whoever. That's what comes to me. They're not scared of anything."

Before the case was submitted to the jury, Canady moved for judgment of acquittal. Regarding count II, willful injury causing serious injury, he argued that because the State's theory was Canady's fighting with Harrison and there was no evidence Harrison suffered a serious injury from the fist fight, the jury could not be instructed on that charge. The district court agreed, ruling the jury would not be

instructed on willful injury causing serious injury (a class "C" felony) but would be instructed on the lesser-included charge of willful injury causing bodily injury (a class "D" felony).

The jury found Canady guilty of voluntary manslaughter, which is a lesser-included charge of first-degree murder; willful injury causing bodily injury; and assault causing bodily injury. Canady was later sentenced to prison terms of ten years, five years, and one year, respectively, with all three sentences running consecutively to one another. The court also ordered Canady to serve the sentences consecutive to his sentence in another case.

Canady appeals.

## II. Discussion.

### A. Evidentiary Challenges.

Canady challenges several the court's evidentiary rulings. "We review evidentiary rulings for an abuse of discretion." *State v. Wilson*, 878 N.W.2d 203, 210 (Iowa 2016). "We review hearsay claims, however, for corrections of errors at law." *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021).

We consider each of Canady's evidentiary challenges in turn.

**1. Rap Video.** Canady challenges the admission of the video extracted from D.E.'s phone that showed him with D.E. while rapping along to a song on April 26. Canady challenged the admissibility of the evidence in a motion in limine, arguing "[t]here is no probative value to the introduction of this video and any probative value is outweighed by the danger of unfair prejudice to the defendant." *See* Iowa R. Evid. 5.403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); *see also State v. Lacey*, 968 N.W.2d 792, 807 (Iowa 2021) ("Whether evidence should be excluded under rule 5.403 is a two-part test: 'First, we consider the probative value of the evidence. Second, we balance the probative value against the danger of its prejudicial or wrongful effect upon the triers of fact.'" (citation omitted)). Canady noted the State's theory regarding his motive to harm Harrison was a phone call from Rockwood to Canady on April 30—four days after the video was recorded.

The State filed a written resistance to Canady's motion in limine. It claimed:

> One of the rap videos was dated April 27, 2021, which is a matter of days prior to the murder, and relevant to Lawrence Canady's intent and motive. The evidence shows that Lawrence Canady may have had a motive and intent to kill Martez Harrison that predated the jail phone call of April 30.

The district court ruled the evidence was admissible, concluding that while it was difficult to make out what Canady was saying in the video, "there are at least two references to a 'Tez'" and those references "are depictions of violence or threats towards or to 'Tez.'" After noting the video was "highly prejudicial to the defendant," the court concluded "the probative value of the evidence regarding [Canady's] intent is at least as highly probative as its prejudicial effect."

We disagree.[2] While the State claimed in its resistance that the evidence showed Canady "may have had a motive and intent to kill Martez Harrison that predated the jail phone call of April 30," the evidence actually introduced at trial was devoid of anything suggesting Canady had the motive or intent to kill Harrison

---

[2] We have watched the video many times; we hear only one reference to Tezzo or Teso. Regardless, a second mention of the name would not change our analysis.

before he received the phone call from Rockford on April 30.[3]  Multiple witnesses

testified Harrison and Canady were friends and, while they had fought at times in

the past, they had always made up.

The State wants us to rely on the existence of the rap video itself as

evidence of Canady's intent to harm Harrison[4]—thereby making it relevant and

probative.  But without other evidence to suggest Canady wanted to harm Harrison

as of April 26, we will not imbue meaning to Canady's rapping along to a popular

diss track[5] that includes several names,[6] including one that sounds like the name

---

[3] The State seemed to recognize as much; during its opening statement, the prosecutor argued:

> And these—these events began with evidence of a jail phone call. The jail calls over at the jail were recorded on April 30th around noon. An inmate, his name is Austin Rockwood, made a phone call to Lawrence Canady.  Rockwood told Canady, Martez Harrison assaulted my girlfriend, Mariah.  He took a beer bottle to her face, put her in the hospital.  You're going to hear Lawrence Canady's voice on that jail phone call, and you're going to hear his anger, how mad he was.  You're going to hear Lawrence Canady's voice say, I'm going to knock him on his head.  He's going to cuss and say, I'm going to knock him on his head dead.  This is evidence of Lawrence Canady's motive.

[4] The State notes the lyrics were not written by Canady but emphasizes the fact that Canady chose a song that includes a name that sounds like Tezzo and then decided to record himself performing it.  But we have no information regarding whether Canady often rapped and recorded himself; there might have been many songs that Canady chose to perform and record.  Just because the State chose to show this one specific video to the jury does not necessarily follow that Canady made only one video of himself rapping.

[5] A "diss" (or "dis") is "a disparaging remark or act."  *Diss*, Merriam-Webster, https://www.merriam-webster.com/dictionary/diss (last visited July 5, 2023).

[6] At oral arguments, the State emphasized that no one alerted the district court that the words on the rap video were from a song by a well-known rap group.  We recognize the district court was not told the name of the group who wrote the song or the number of views the song has received, but we think it is clear from the rap video that Canady is singing along to a previously recorded song.  The reasons for the district court to exclude the video would have been stronger if the court was informed of more details surrounding the track.

of a decedent.[7]  Common sense tells us that people often sing and rap along to songs without those songs being autobiographical.  *Cf. State v. Leslie*, No. 12-1335, 2014 WL 70259, at *6 (Iowa Ct. App. Jan. 9, 2014) (finding the presentation of a rap video would have been unduly prejudicial where "there [was] certainly no evidence that everything [the decedent] mentioned in the rap videos reflected his personal life").

With little to no probative value, the risk of unfair prejudice from the admission of the video was high.  The video shows Canady rapping along to lyrics involving violent imagery.  *See* Andrea Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, & Criminal Evidence*, 31 Colum. J.L. & Arts 1, 30 (2007) ("To the extent that individuals associate rap music with crime and criminal behaviors, they negatively perceive defendants who are involved with rap music.").  Canady also adlibs the words "gang gang gang" over a part of the track while showing a tattoo on his hand and then panning over to seventeen-year-old D.E. fanning out a stack of cash.  We believe the inclusion of this evidence may have suggested to the jury that Canady was a member of a gang.  *See State v. Nance*, 533 N.W.2d

---

[7] According to Erin Lutes et al., *When Music Takes the Stand: A Content Analysis of How Courts Use and Misuse Rap Lyrics in Criminal Cases,* 46 Am. J. Crim. L. 77, 84 (2019):

Gangsta rap, in particular, "operates within a well-documented poetic tradition within African American culture that ritualizes invective, satire, obscenity and other verbal phenomena with transgressive aims."  In so doing, the genre often emphasizes violence in inner-cities, especially as it relates to gangs, albeit not necessarily in an accurate manner.  Rather, there are "lyric formulas" in rap music, a key one of which involves fictionalized bragging about the performer's sexual prowess, talent, wealth, and "badness" vis-à-vis criminal behavior.

(Footnotes omitted.)

557, 562 (Iowa 1995) ("[E]vidence of gang membership and activity is inherently prejudicial. It appeals to the jury's instinct to punish gang members."). The admission of the video was unfairly prejudicial because it "ha[d] an undue tendency to suggest a decision on an improper basis." *Lacey*, 968 N.W.2d at 807 (citation omitted). The district court abused its discretion in admitting the video.

**2. Audio Recording of Jail Phone Call.** Canady challenges the admission of the audio recording of Rockwood from the jail, arguing the State failed to lay the proper foundation that the person speaking to Rockwood on the call was Canady. In the alternative, he argues that any statements made by Rockwood were hearsay statements not admissible pursuant to any exception, so the recording should not have been admitted.

We begin with the claims about proper foundation. Our test for admitting recorded conversations is whether the evidence establishes the recordings are accurate and trustworthy. *See State v. Weatherly*, 519 N.W.2d 824, 825 (Iowa Ct. App. 1994). For evidence to be admissible, it must satisfy foundational requirements. Iowa Rule of Evidence 5.901 deals with authenticating and identifying evidence. At the time of Canady's trial, it stated in part:

> a. *In general.* To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
> b. *Examples.* The following are examples only—not a complete list—of evidence that satisfies the requirement:
> (1) *Testimony of witness with knowledge.* Testimony that an item is what it is claimed to be.
> . . . .
> (5) *Opinion about a voice.* An opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

> (6) *Evidence about a telephone conversation.* For a telephone conversation, evidence that a call was made to the number assigned at the time to:
>
> (A) A particular person, if circumstances, including self-identification, show that the person answering was the one called . . . .

Iowa R. Evid. 5.901.

In its ruling on the motion in limine, the district court concluded:

> [Canady] seeks to prevent the State from introducing into evidence the contents of a phone call purportedly between Austin Rockwood and [Canady] . . . . The State contends that the phone call contains admissions by a party opponent under [Iowa] Rule [of Evidence] 5.801(d)(2)(A). The Court finds that if the State is able to create a proper authentication for the recording of the phone call under [r]ule 5.901(a)(5) or (6) that it would be admissible as admissions by a party opponent under [r]ule 5.801(d)(2)(A). The jail phone log will establish that the call was with Austin Rockwood and references were made to "L" by Rockwood during the call. As long as State's witnesses are able to lay the foundation that "L" would be a reference to [Canady] and/or can identify [Canady's] voice on the call, the call would be admissible as admissions by a party opponent to show [Canady's] reaction to the allegation that "Tezzo" had assaulted Rockwood's girlfriend.

At trial, Jorma Schwedler, a sergeant from the county jail, testified about how the jail phone calls are recorded. Schwedler also testified as to the specific nine-digit phone number Rockwood dialed on April 30. That phone number was linked to Canady through the testimony of Officer Josh Tyler. Additionally, both Goodman and Detective Paul Yaneff testified they were familiar with the voices of Rockwood and Canady and identified theirs as the voices on the phone calls. This is sufficient foundation.[8] *See, e.g.*, *State v. Reynolds*, No. 15-0226, 2016 WL 6652311, at *6 (Iowa Ct. App. Nov. 9, 2016).

---

[8] Canady complains the district court admitted the call before all these identifications were made. But any alleged error in the premature admission of the recording was harmless, as the necessary foundation was ultimately laid. *Cf.* Iowa

Next, Canady concedes that if it was established it was him speaking with Rockwood on the recording, his statements were admissible against him. *See* Iowa R. Evid. 5.801(d)(2)(A) (defining an opposing party's statement made by party as non-hearsay). Still, he claims that the recording was inadmissible because Rockwood's statements were hearsay that did not fall within any exception. But the State did not offer Rockwood's statements for the truth of the matter asserted, so they were not hearsay. *See* Iowa R. Evid. 5.801(c) (defining a statement as hearsay when the statement was not made while testifying at trial *and* it was "offer[ed] into evidence to prove the truth of the matter asserted in the statement"). There was no need to prove whether Harrison hit Rockwood's girlfriend with a bottle. As the district court found, the purpose of the offering Rockwood's statements was to show Canady's reaction to the information regardless of whether that information was true. *See McElroy v. State*, 637 N.W.2d 488, 501 (Iowa 2001) ("[A] statement that would ordinarily be deemed hearsay is admissible if it is offered for a non-hearsay purpose that does not depend upon the truth of the facts presented. For example, the statement may be offered simply to demonstrate it was made, to explain subsequent actions by the listener, or to show notice to or knowledge of the listener." (internal citations omitted)).

The jail phone call was properly admitted.

---

R. Evid. 5.103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right . . . ."); *State v. Redmond*, 803 N.W.2d 112, 127 (Iowa 2011) ("A trial court's erroneous admission of evidence is only reversed on appeal if 'a substantial right of the party is affected.' An erroneous evidentiary ruling is harmless if it does not cause prejudice." (internal citation omitted)).

**3. D.E.'s Snapchat Photo.** Finally, Canady challenges the admission of the pictures posted to D.E.'s Snapchat account, which showed D.E. with J.H. and was captioned, "We bussing but don't think shit sweat [gun emoji]." Canady argues the statement written on the picture was inadmissible hearsay and that any probative value of the exhibit was substantially outweighed by the danger of unfair prejudice. We start with his second argument first because even if the statement falls within an exception to hearsay, it must still pass rule 5.403 muster to be admitted.[9] *See State v. Dullard*, 668 N.W.2d 585, 589 (Iowa 2003) ("[A] district court has no discretion to deny the admission of hearsay if the statement falls within an enumerated exception, subject, of course, to the rule of relevance under rule 5.403 . . . .").

Like Canady, we question the probative value of the exhibit. In its argument for admission, the State lumped this exhibit in with others and claimed it was relevant "to show that [D.E.], [J.H.], and Canady are connected and that they shared the same common purpose to seriously injure and kill Martez Harrison." But the exhibit does nothing to show Canady was connected to D.E. and J.H. Canady is not in the photo, and there is no evidence he was ever even aware of its existence. As Canady argued in his motion in limine:

> [Trial exhibit 52] is a social media post of [D.E.] and [J.H.] with a message that shows a small image of a gun. [Canady] is not pictured or referenced in the post. No relevance or connection to [Canady] is apparent in the social media posts. Introduction of such evidence is merely an attempt to show guilt by association and is not probative of any charge against this defendant.

---

[9] The district court ruled the photo could be admitted as a statement of a co-conspirator; it did not consider whether the evidence was unduly prejudicial under rule 5.403.

The exhibit is not relevant for the purpose it was offered by the State. And the risk of undue prejudice was high. Especially after the court allowed Goodman to testify as to what she believed D.E.'s caption on the photo meant: "I'm pretty sure he meant sweet. But, basically, that they got the guns and they're not sweating shit." Again, without any evidence Canady even knew about this statement, the risk of undue prejudice substantially outweighed the probative value of the exhibit.

The district court abused its discretion in admitting exhibit 52.

**4. Remedy.**

The State argues that even if the court should not have admitted the rap video and the Snapchat post, any error was harmless. *See State v. Thoren*, 970 N.W.2d 611, 636 (Iowa 2022) ("When a district court commits a nonconstitutional error by admitting evidence it should have excluded, we do not reverse the defendant's conviction if the error was harmless."). The State focuses on the fact that the jury did not convict Canady of first-degree murder, which it takes to mean the jury was not moved or persuaded by the rap video or the picture—both of which the State argued showed Canady was involved with a plan to kill Harrison.

But we cannot confidently say that Canady was not "injuriously affected by the error" and did not "suffer[] a miscarriage of justice." *Id.* (citation omitted). While the evidence supporting his convictions for willful injury causing bodily injury and serious assault was overwhelmingly strong—his actions having been both caught on video and largely uncontested—his role in the shooting death of Harrison is much less clear. Moreover, our standard requires us to "presume prejudice and 'reverse unless the record affirmatively establishes otherwise.'" *Id.* at 637 (citation omitted).

So, we reverse Canady's convictions. Because retrying Canady is only appropriate if substantial evidence exists, we must still reach Canady's sufficiency-of-the-evidence claim regarding his conviction for voluntary manslaughter.[10] *See Dullard*, 668 N.W.2d at 597 (providing that double jeopardy principles prohibit a retrial "when the defendant's conviction is reversed on grounds that the evidence was insufficient to sustain the conviction").

**B. Sufficiency of the Evidence.**

Canady challenges the sufficiency of the evidence supporting his conviction for voluntary manslaughter. "In determining whether there was substantial evidence, we view the evidence in the light most favorable to the State." *State v. Abbas*, 561 N.W.2d 72, 74 (Iowa 1997). "Substantial evidence means such evidence as could convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* "In determining if there was substantial evidence, we consider all of the evidence in the record, not just the evidence supporting a finding of guilt." *Id.*

To properly convict Canady of voluntary manslaughter, the State had the burden to prove all of the following:

> 1. On or about the 1st day of May 2021, the defendant aided and abetted [D.E.] in shooting Martez Harrison with a gun.
> 2. Martez Harrison died as a result of being shot by [D.E.] with a gun.
> 3. The shooting was done solely by reason of sudden, violent and irresistible passion resulting from serious provocation.
> 4. Neither Lawrence Canady nor [D.E.] were acting with justification.

---

[10] Canady does not question the sufficiency of the evidence supporting his other two convictions.

The jury was further instructed that:

> "Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the defendant's earlier participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting." Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting."

Here, Canady challenges the evidence supporting the first element—that he aided and abetted D.E. in shooting Harrison. But Canady's recitation of the evidence casts doubt and raises credibility questions on some of the witnesses' testimony, which is not part of our review on sufficiency claims. "When evaluating sufficiency-of-the-evidence challenges, we do not resolve conflicts in the evidence, pass upon the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence . . . ." *State v. Howland*, No. 22-0519, 2023 WL 3613259, at *2 (Iowa Ct. App. May 24, 2023) (citing *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006)).

Viewing the evidence in the light most favorable to the verdict, a rational factfinder could determine that Canady and his friends—including D.E., who was carrying a gun—sought out Harrison to harm him in retaliation for hitting Rockwood's girlfriend. Canady and his friends tried to get inside the bar to get to Harrison, but they were stopped by the bar's bouncer and the manager. When the manager spoke to Canady to tell him he was not allowed in, Canady responded that they would be waiting outside for Harrison and told the manager they had a gun. Recognizing the trouble outside, Harrison called his fiancée for a ride home. When Goodman arrived a short time later, Canady and his friends surrounded her

outside the bar. Goodman heard Cannady tell D.E. to "just go ahead and get that," which Goodman understood to mean a gun. At about that time, Harrison exited the bar and came out near the group. Canady punched Goodman in the face, which led to Harrison and Canady physically fighting. While Canady and Harrison were on the ground, D.E. shot Harrison one time. Canady did not stop hitting Harrison; he did not turn around to check who fired the shot, nor did he run for cover. As Canady continued hitting Harrison, D.E. walked closer and fired a second shot. Canady hit and then kicked Harrison a few more times before fleeing in a car; D.E. fled on foot with the gun. When police stopped Canady in the car just a few minutes later, Canady told them the shooter fled in a Chrysler 300.

A jury could infer from Canady instructing D.E. to get a gun once Goodman arrived to pick Harrison up (when it made sense to expect Harrison to exit the bar) and his continued fighting with Harrison even after D.E. fired the first shot[11] that he was actively participating in or knowingly advising or encouraging D.E.'s shooting of Harrison. So, there is substantial evidence to support Canady's conviction for voluntary manslaughter.

### C. Sentencing.

Because we reverse Canady's convictions and remand for new trial, we do not consider his challenges to the sentences imposed by the district court.

## III. Conclusion.

Because the district court abused its discretion in admitting the rap video and the Snapchat picture, we reverse Canady's convictions. As substantial

---

[11] The medical examiner testified "that both wounds were potentially fatal."

evidence supports Canady's conviction for voluntary manslaughter, he can be retried on that, as well as willful injury causing bodily injury and assault causing bodily injury.

**REVERSED AND REMANDED FOR NEW TRIAL.**